IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

**June 14, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 12-0206

_____

GADDY ENGINEERING COMPANY,
Plaintiff Below, Petitioner

v.

BOWLES RICE MCDAVID GRAFF & LOVE, LLP,
and J. THOMAS LANE, individually,
Defendants Below, Respondents

_____

Appeal from the Circuit Court of Roane County
Honorable Thomas C. Evans, III, Judge
Civil Action No. 10-C-27

AFFIRMED

_____

Submitted: April 17, 2013
Filed: June 14, 2013

Paul J. Harris, Esq.                          David D. Johnson, III, Esq.
Wheeling, West Virginia                   Winter Johnson & Hill PLLC
Counsel for Petitioner                      Charleston, West Virginia
                                                      Counsel for Respondents

The Opinion of the Court was delivered PER CURIAM.
JUSTICE DAVIS and JUSTICE LOUGHRY concur and reserve the right to file concurring opinions.
JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1. "Under the doctrine of impracticability, a party to a contract who claims that a supervening event has prevented, and thus excused, a promised performance must demonstrate each of the following: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed, either expressly or impliedly, to perform in spite of impracticability that would otherwise justify his nonperformance." Syl. Pt. 2, *Waddy v. Riggleman*, 216 W.Va. 250, 606 S.E.2d 222 (2004).

2. "'Fraud cannot be predicated on a promise not performed. To make it available there must be a false assertion in regard to some *existing* matter by which a party is induced to part with his money or his property.' Syllabus Point 1, *Love v. Teter*, 24 W.Va. 741 (1884)." Syl. Pt. 3*, Croston v. Emax Oil Co*., 195 W.Va. 86, 464 S.E.2d 728 (1995).

Per Curiam:

The petitioner, Gaddy Engineering Company ("Gaddy"), appeals from an adverse summary judgment ruling entered by the Circuit Court of Roane County on January 12, 2012, in a case that involves an alleged fee-sharing agreement between Gaddy and the respondents. The respondents are an individual lawyer, J. Thomas Lane, and the Charleston, West Virginia, law firm in which Mr. Lane is a partner–Bowles Rice McDavid Graff & Love, LLP ("Bowles Rice"). At the center of this dispute is the petitioner's contention that Mr. Lane agreed to pay Gaddy one-third of all sums Bowles Rice received in connection with its provision of legal representation to a group of land companies in a case to be filed against Columbia Natural Resources ("Columbia") for alleged underpayment of gas royalties.[1] Through two separate orders, the circuit court granted summary judgment to the respondents as to all of the claims Gaddy asserted against the respondents.[2] Upon a meticulous review of the sizeable record submitted to this Court and in consideration of well-established principles of law, we conclude that the circuit court did not commit error. Accordingly, we affirm.

[1]Rather than directly pursuing relief from Columbia Natural Resources through either individual actions or a consolidated action as initially contemplated by Gaddy and Mr. Lane, the land companies opted to join a class action that involved approximately 8,000 plaintiffs. *See Estate of Tawney v. Columbia Natural Resources*, Civil Action No. 03-C-10E, Roane County Circuit Court.

[2]By ruling entered on September 19, 2011, the circuit court initially granted summary judgment as to all claims arising from the alleged breach of contract. In a subsequent order entered on January 12, 2012, the circuit court granted summary judgment on the remaining counts asserted by Gaddy in this civil action.

## I. Factual and Procedural Background

In December 2003, John Bullock, the president of Gaddy,[3] approached Mr. Lane to discuss exploring whether Columbia was underpaying its royalty obligations.[4] In January or February 2004, Gaddy and the respondents reached a verbal agreement to jointly evaluate potential claims on behalf of their current clients as well as other additional land company lessors. The stated objective for the proposed evaluations was to ascertain (1) whether there were viable claims; (2) whether the lessors wished to pursue such claims; and (3) whether the likely value of those claims would justify the cost of litigation against Columbia. Under the terms of this agreement, Gaddy would assess the lessors' past and future losses from underpayment of royalties while Bowles Rice would review the respective leases to evaluate the lessors' individual legal claims. In order to attract the largest pool of potential clients, Mr. Lane and Gaddy agreed to charge a reduced flat fee of $1,750 for this evaluation.[5] That combined charge would include a $750 fee for Gaddy's assessment and a $1000 fee for the legal work performed by Bowles Rice.[6]

---

[3]Gaddy is a company that provides land and natural resource management services.

[4]Mr. Bullock stated in his affidavit that he "explored why Columbia Gas routinely paid approximately 67% less royalties than other gas companies."

[5]The parties concur that the flat fee charged to the land companies for the initial evaluations did not fully compensate either of them for their time and work product.

[6]Gaddy would send a separate invoice for each damage evaluation it performed and Bowles Rice would then invoice the lessor for the total fee of $1,750. Upon its receipt of payment, Bowles Rice would remit $750 to Gaddy in payment of its submitted invoice.

In accordance with the terms of this undisputed aspect of the agreement, Mr. Lane contacted various land companies in writing and offered the claim evaluation described above. In response to the letters distributed by Mr. Lane through Bowles Rice, a number of land companies sought the claim evaluation which was then jointly performed by the parties. As a result of these evaluations, twelve land companies (the "land companies") decided to utilize the services of Bowles Rice to pursue litigation against Columbia in connection with its alleged underpayment of royalties.

The controversy at the center of this case stems from Gaddy's allegation that Bowles Rice, through Mr. Lane, agreed to give the petitioner one third of any recovery it received for pursuing claims against Columbia.[7] According to the respondents, John Bullock proposed more than once that Gaddy should receive some percentage of any legal fee Bowles Rice obtained as a result of the Columbia litigation.[8] The respondents, however, deny that they ever agreed to this proposal. Through his affidavit and during his deposition, Mr. Lane avowed that in the event Bowles Rice initiated litigation against Columbia on behalf of the land companies, his understanding was that Gaddy would serve as a litigation consultant and that Gaddy would separately negotiate a fee agreement with the respective clients. In Mr.

[7]Gaddy had no dispute with the fee distribution for the claim evaluations. *See supra* note 6.

[8]The petitioner readily admits that Mr. Lane explained that a fee-sharing agreement between a lawyer and a nonlawyer was prohibited; Gaddy maintains, however, that Mr. Lane suggested there were ways to get around this fee-sharing impediment.

3

Lane's mind, this fee agreement between Gaddy and the land company clients would have been structured to include a bonus feature in the event of a favorable outcome.

When the parties began their joint venture, they were aware of a pending action before the Circuit Court of Roane County–the *Tawney* case[9]–which involved a large group of oil and gas lessors seeking damages against Columbia for alleged royalty underpayments.[10] Due to concerns based on the proposed class size and differing lease terms, it was unclear for some time whether that case would be certified as a class action. Following its decision to certify the class in *Tawney*,[11] the circuit court imposed a deadline of October 15, 2004, for class members to opt out of the class action.

Despite the recommendation by Bowles Rice that the land companies exercise the option to pursue their claims in the Circuit Court of Kanawha County rather than as a part of the class action, the land companies decided to participate in the *Tawney* case. From that point forward, the possibility that Bowles Rice would be prosecuting independent claims for the land companies ceased to exist. And, while Bowles Rice registered a formal appearance

---

[9]*See supra* note 1.

[10]That action was initiated on February 3, 2003.

[11]Certification was approved by the circuit court's order entered on February 27, 2004; this Court, by order entered on June 10, 2004, refused a petition seeking a writ of prohibition to prevent enforcement of the certification ruling.

in *Tawney* on behalf of a subclass composed of its land company clients,[12] Marvin Masters, as lead counsel, was in control of the litigation decisions affecting the plaintiff class.[13]

When Mr. Lane approached class counsel to inquire about allowing Gaddy to serve as an expert consultant, Mr. Masters stated that he had already retained an expert witness and had no use for Gaddy's services. He did indicate, however, a willingness to seek court approval of the claim evaluation work Gaddy had previously performed if the plaintiffs were successful in establishing their royalty claims. In February 2006, Mr. Lane informed Gaddy that he would need to submit an invoice to the circuit court reflecting hourly rate charges for its claim evaluation work. On January 31, 2007, during the week after the jury verdict was returned in *Tawney*,[14] Gaddy submitted an invoice to Bowles Rice for the amount of $367,225. This invoice, which we refer to as the "Bullock invoice," purported to charge for work performed by Mr. Bullock on a weekly basis from January 1, 2000, through the end of 2006.[15] Because the invoice reflected time for work that preceded any agreement between the respondents and Gaddy by more than four years as well as charges for work that clearly

---

[12]This appearance occurred on December 7, 2004,

[13]Marvin Masters and the law firm of Masters & Taylor, L.C. and Michael W. Carey and George M. Scott and the law firm of Carey, Scott & Douglas were appointed as class counsel for the plaintiffs in the *Tawney* case in the certification order.

[14]The verdict returned was for more than 400 million dollars.

[15]The amount of fees that Mr. Bullock sought for his time in the matter was $258,400.

post-dated the "opt out" date of October 15, 2004, Mr. Lane told Mr. Bullock he could not submit that invoice to the trial court for payment approval. Based on Mr. Lane's insistence that a new invoice reflecting work performed by Gaddy beginning in March 2004 would be required, Gaddy submitted a revised invoice to Bowles Rice on February 14, 2007. That invoice, which we refer to as the "McCullough invoice," set forth a total of $74,275 in charges which pertained primarily[16] to work performed by Gaddy's Vice President Frank McCullough[17] from March 5 through July 27, 2004.

Bowles Rice submitted the McCullough invoice to the circuit court and obtained approval for the work and expenses Gaddy reflected on the invoice. When Bowles Rice tendered payment to Gaddy for the full amount of the McCullough invoice after receiving its counsel fee and expense reimbursements, the payment was refused. Gaddy later instituted this civil action against the respondents on May 14, 2010, asserting claims for breach of contract; professional negligence; negligence; gross negligence; negligent misrepresentation; fraud; conversion; promissory estoppel; unjust enrichment; and quantum meruit.

---

[16]While there were no charges included on the McCullough invoice for work performed solely by Mr. Bullock, there were three charges of two to four hours included for work performed by Gaddy employees, which totaled less than one thousand dollars. While all three of these charges occurred in 2006, it appears that they relate to internal meetings among Gaddy employees pertaining in one instance to a review of time charges.

[17]Mr. McCullough began working at Gaddy as an independent contractor in mid-2003 and immediately started looking into the royalty payment issues involving Columbia.

In its motion to dismiss the complaint, the respondents argued that the doctrine of illegality stood as a bar to the enforcement of the alleged fee-sharing agreement[18] in view of the public policy violation indicated by the Rules of Professional Conduct (the "Rules"). In ruling on the motion to dismiss, the trial court observed that this Court had never addressed the precise question of whether the ethical violation that results from a fee-sharing agreement between a lawyer and a nonlawyer would render the agreement void and unenforceable as a matter of public policy.[19] Looking to the language designated in the "scope" section of the Rules, the trial court found guidance in the language which provides that the rules "are not designed to be a basis for civil liability" but are offered to "provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Citing both the hortative introductory language of the Rules and the lack of governing precedent, the trial court denied the respondents' motion to dismiss.

After discovery had been completed, the respondents filed a motion seeking summary judgment. Upon considering the respondents' argument that application of the doctrine of impracticability[20] excused the performance of any alleged fee-sharing agreement,

---

[18]In moving to dismiss the complaint, the respondents denied the existence of the alleged fee-sharing agreement.

[19]*See* R. Prof'l Cond. 5.4 (prohibiting fee-sharing agreements between lawyers and nonlawyers).

[20]*See* Syl. Pt. 2, *Waddy v. Riggleman*, 216 W.Va. 250, 606 S.E.2d 222 (2004).

7

the trial court agreed and granted summary judgment to the respondents as to the petitioner's breach of contract claim by order entered on September 19, 2011. In its subsequent ruling, which was entered on January 12, 2012, the trial court granted summary judgment to the respondents on the remaining counts of the complaint, expressly finding no genuine issues of material fact as to any of the multiple claims asserted by the petitioner. It is from these adverse rulings that the petitioner seeks relief.

## II.  Standard of Review

Our review of the trial court's grant of summary judgment is *de novo*. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). It is axiomatic that summary judgment "should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co.*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Against these standards, we proceed to determine whether the trial court's decision to grant summary judgment to the respondents was in error.

## III.  Discussion

### A. Doctrine of Impracticability

In its first order granting summary judgment in this matter, the trial court addressed the applicability of the doctrine of impracticability to the petitioner's breach of

8

contract claim. Once the land companies decided to participate in the *Tawney* class action, the respondents contend that the parties were no longer capable of performing the alleged fee-sharing agreement as that agreement presumed that Bowles Rice would individually prosecute the claims of the land companies. As a consequence, the respondents argued that even if a jury should find the existence of a fee-sharing agreement between the parties, the doctrine of impracticability would excuse their performance of all obligations under the agreement.

This doctrine, which was previously referred to as the doctrine of impossibility, developed through the common law as a means of alleviating, in limited circumstances, the harsh results brought about by requiring absolute contractual performance. *See Waddy v. Riggleman*, 216 W.Va. 250, 256, 606 S.E.2d 222, 228 (2004). Adopting the modern position –the rule of impracticability–this Court held in syllabus point two of *Riggleman*:

> Under the doctrine of impracticability, a party to a contract who claims that a supervening event has prevented, and thus excused, a promised performance must demonstrate each of the following: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed, either expressly or impliedly, to perform in spite of impracticability that would otherwise justify his nonperformance.

9

*Id.* at 252, 606 S.E.2d at 224.[21]

In its ruling, the circuit court found that the fee-sharing agreement alleged by Gaddy presupposed that Bowles Rice would individually prosecute civil actions against Columbia on behalf of the land companies; that Bowles Rice would enter into a contingent fee agreement with each of those land company clients entitling it to a fee of one-third of any recovery; that Bowles Rice would rely on Gaddy to provide expert litigation support services for the claims against Columbia; and that Bowles would tender to Gaddy one-third of its one-third fee in the event of any recovery. As the trial court reasoned, in applying the factors set forth in *Riggleman*, the non-occurrence of the presupposed events rendered performance by Gaddy and the respondents impracticable. In reaching that decision, the trial court determined that the respondents did not control the decision of the landowner clients with regard to their participation in the *Tawney* class action; did not have control of the *Tawney*

---

[21]Our holding in *Riggleman* was informed by the Restatement (Second) of Contracts section entitled Discharge by Supervening Impracticability, which provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

216 W.Va. at 257, 606 S.E.2d at 229 (quoting Restatement (Second) of Contracts § 261 (1979)).

10

litigation; did not enter into contingency fee agreements with the landowner clients; and did not have control over the decision to hire an expert consultant in the *Tawney* case.

Central to the application of the doctrine of impracticability is a determination that the party who seeks to be excused from performance was not at fault or had no control as to the nonoccurrence of the presupposed event upon which the contract depended. *See Frederick Mgt. Co. v. City Nat'l Bank*, 228 W.Va. 550, 560, 723 S.E.2d 277, 287 (2010) (holding that genuine issues of fact regarding fault of party seeking to be excused from contract performance prevented application of doctrine of impracticability). In this case, the trial court found that "the uncontradicted evidence is that Bowles Rice and J. Thomas Lane did not cause, directly or indirectly, the large landowner group of clients to decide to remain in the *Tawney* class action litigation." As the circuit court reasoned, [t]his was the event that set in motion the impracticability of performance by both Plaintiff Gaddy and Defendants Bowles Rice and J. Thomas Lane."

In challenging the trial court's ruling on this issue, Gaddy maintains that it provided litigation support for the plaintiffs in the *Tawney* case. The record does not support this contention. The bulk of the work that Gaddy performed,[22] and for which it sought and the court approved payment, predated the October 2004 "opt out" date. When Mr. Lane

---

[22]*See supra* note 16.

refused to submit the Bullock invoice purporting to delineate work performed from 2000 to 2006, and then Mr. Bullock subsequently transmitted the McCullough invoice to Mr. Lane as a replacement document without any correspondent charges for his time, Mr. Bullock essentially acknowledged that the first invoice was fabricated. And, when Mr. Lane, upon his receipt of the McCullough invoice, inquired of Mr. Bullock regarding an additional invoice reflecting his personal time charges, Mr. Bullock stated by means of electronic correspondence dated February 11, 2007, that he would not be submitting a separate invoice as he "didn't keep good enough record." [sic]

The record in this case supports the trial court's finding that "the undisputed evidence . . . shows that Gaddy in fact did stop working on these claims in 2004, at the time the large landowner clients refused Defendant Lane's recommendation and elected to remain as class members in the *Tawney* litigation." Mr. Bullock's affidavit, as the respondents point out, lacks any chronological point of reference regarding his "perform[ance of] an enormous amount of work that took years to complete."[23] That vague avowal[24] and the complete lack

[23]In explanation of what work he performed, Mr. Bullock stated:

> I regularly conducted research into Columbia Gas' post-production expenses, administrative expenses, and impression expenses. I also researched Columbia Gas' Securities and Exchange Commission (SEC) filings and compared those filings with the filings of other gas companies. . . . I contacted numerous land companies, engineers, and attorneys to discuss
>
> (continued...)

12

of any time submission by Mr. Bullock for the relevant time period (February/March 2004 to October 2004) suggests that whatever time Mr. Bullock personally invested in the matter preceded the decision of the parties to jointly investigate the royalty underpayment issues. Moreover, there is no evidence that the respondents agreed, as part of the alleged fee-sharing agreement, to share fees with Gaddy even if the presupposed events did not transpire (i.e. to perform despite the occurrence of impracticability). Having determined that the trial court correctly applied the doctrine of impracticability, we find no error in the trial court's decision to grant summary judgment as to the breach of contract claims under this doctrine.

## B. Attorney-Client Relationship

In its order of September 19, 2011, the trial court determined that there were no genuine issues of material fact with regard to whether there was an attorney-client relationship between Gaddy and the respondents. The circuit court ruled that

---

[23](...continued)
> the legality of Columbia Gas' actions. I also coordinated numerous meetings with potential litigants against Columbia Gas.

[24]The respondents suggest that Mr. Bullock's affidavit, signed a month and a half after his deposition was taken, conflicts with his deposition testimony and thus renders it a "sham affidavit." *See Kiser v. Caudill*, 215 W.Va. 403, 410, 599 S.E.2d 826, 833 (2004). At his deposition, Mr. Bullock stated that he had no idea whether any of Gaddy's work product had been used in the *Tawney* case. As to the question of whether Gaddy had been asked by Bowles Rice to do any work relating to Columbia once the claim evaluation work performed by Mr. McCullough was completed, Mr. Bullock could not provide an affirmative answer. Mr. Bullock did testify, however, that he, personally, was not asked to do any work after the claim evaluation period ended.

13

> only one conclusion can be drawn from the undisputed facts, and it is that the relationship was one between a law firm representing certain clients on the one hand and, on the other, a litigation support service provider engaged by the law firm/attorney to provide services for those same clients in anticipated litigation.

To challenge this ruling, Gaddy offered the deposition testimony of one of its employees–Mr. McCullough–where he indicated his personal opinion that Bowles Rice was Gaddy's attorney as well as Mr. Lane's proffer of "advice" to Gaddy that it not appear at the hearing before the circuit court in *Tawney* on the issue of fees and expenses.

There was never any assertion, as the respondents make clear, that Gaddy had any intention of being a party-plaintiff in any litigation that might ensue against Columbia. A review of the submitted record in this matter demonstrates a working relationship between Gaddy and the respondents for the purpose of evaluating potential royalty underpayment claims for their mutual clients. The record does not support Gaddy's contention that the respondents undertook a client-lawyer relationship with regard to Gaddy. Furthermore, as the respondents note, Gaddy never articulated any breach of a professional duty owed to it by them or offered any evidence tending to support any alleged breach.[25] Finding no error as to the trial court's ruling on the lack of an attorney-client relationship between Gaddy and

---

[25]Gaddy's failure to produce any billing statements from the respondents "for services rendered" further supports the lack of any client-lawyer relationship between the parties.

14

the respondents, we coextensively find no error in the trial court's decision to grant summary

judgment on the petitioner's professional negligence claim.

## C. Fraud

The petitioner's fraud claim is wholly predicated on the alleged fee-sharing

agreement. After reasserting the terms of the alleged agreement, the petitioner avers that the

respondents made unspecified material and false representations with regard to the alleged

promise to share the prospective contingency fee. In its analysis of the fraud claim, the trial

court stated:

> The undisputed material facts demonstrate that
> Gaddy's evidence is . . . that a promise was made
> by Defendants to pay Gaddy 1/3 of a 1/3
> contingency fee and a failure to pay such sum.
> Gaddy has no evidence that Bowles Rice or Mr.
> Lane made any "intentional misrepresentation of
> a past or existing fact."

In proceeding to grant summary judgment on this claim, the trial court recognized: "'Fraud

cannot be predicated on a promise not performed. To make it available there must be a false

assertion in regard to some *existing* matter by which a party is induced to part with his money

or his property.' Syllabus Point 1, *Love v. Teter*, 24 W.Va. 741 (1884)." Syl. Pt. 3, *Croston*

*v. Emax Oil Co*., 195 W.Va. 86, 464 S.E.2d 728 (1995).

Further addressing the scope of fraud, we explained in *Croston* that

15

> [A]ctionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence.  Somewhat similarly, *it cannot be based on statements which are promissory in nature or which constitute expressions of intention*, unless the non-existence of the intention to fulfill the promise at the time it was made is shown.

*Id.* at 90, 464 S.E.2d at 732 (emphasis supplied).  As was the case in *Croston,* there is no evidence that any representations made by the respondents were untruthful expressions of intention; what the evidence demonstrates instead is "that subsequent events rendered the execution of the intention . . . [impossible]." *Id.* at 91, 464 S.E.2d at 733.  Simply put, the petitioner has fundamentally failed to demonstrate the critical elements necessary to prove fraud. *See* Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981).[26]

Rather than citing to intentional misrepresentations that the respondents made about existing or past facts to prove its fraud case, the petitioner simply redoubled its efforts

---

[26]As we held in *Lengyel*,

> The essential elements in an action for fraud are:  "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him;  (2) that it was material and false;  that plaintiff relied upon it and was justified under the circumstances in relying upon it;  and (3) that he was damaged because he relied on it." *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737 (1927).

167 W.Va. at 272-73, 280 S.E.2d at 67, syl. pt. 1.

16

in trying to prove the existence of the alleged oral fee-sharing agreement.[27] And, by taking this tack, the petitioner has demonstrated what the respondents argued: that the fraud claims asserted by petitioner were simply breach of contract claims masquerading as fraud claims. In seeking to prevent the recasting of a contract claim as a tort claim, courts often apply the "gist of the action" doctrine. Under this doctrine, recovery in tort will be barred when any of the following factors is demonstrated:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Star v.* Rosenthal, 884 F.Supp.2d 319, 328-29 (E.D. Pa. 2012); *accord Backwater Props., LLC v. Range Resources Appalachia, LLC,* No. 1:10CV103, 2011 WL 1706521 at *6 (N.D. W.Va. 2011) (recognizing that "[u]nder the 'gist of the action' doctrine, a tort claim arising from a breach of contract may be pursued only if the action in tort would arise independent of the existence of the contract") (internal citations omitted and quoting Syl. Pt. 9, in part, *Lockhart v. Airco Heating & Cooling, Inc*., 211 W.Va. 609, 567 S.E.2d 619 (2002)); *Cochran v. Appalachian Power Co.*. 162 W.Va. 86, 92-93, 246 S.E.2d 624, 628 (1978)

---

[27]While the petitioner points to electronic communications from Mr. McCullough to Mr. Lane in which Mr. McCullough sought on several occasions in 2007 to obtain a written acknowledgment of a "verbal understanding" of an alleged agreement, the record is utterly devoid of any such writing by which the respondents agreed to a fee-splitting arrangement.

(stating that "where the gist of the action is the breach of contract . . . additional averments . . .will not convert the cause of action into one for tort") (quoting 1 Am. Jur. 2d *Actions* § 8 (1962)).

Succinctly stated, whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract. *See Goldstein v. Elk Lighting, Inc.*, No. 3:12-CV-168, 2013 WL 790765 at * 3 (M.D. Pa. 2013). While the trial court's grant of summary judgment on the fraud claim was not decided pursuant to the "gist of the action" doctrine, we think it is obvious that the petitioner's fraud claims were clearly contract claims disguised as tort claims as the source of the alleged breach of duties was the alleged fee-sharing agreement and not "the larger social policies embodied by the law of torts." *Goldstein*, at * 3.

Because we find no error in the trial court's determination that the petitioner failed to introduce evidence of an intentional misrepresentation of a past or existing fact made by the respondents, we find no basis for disturbing the grant of summary judgment on the petitioner's claim of fraud.

18

**D. Negligence, Gross Negligence and Intentional Breach**

These claims, combined in one count of the complaint, were supported by the bare bones averment that "Defendants negligently, fraudulently and intentionally breached their agreement with, and duty to" the petitioner. The trial court dispensed with this count by ruling that "this is nothing more than Gaddy's breach of contract claim couched in tort terminology" and referenced its previous grant of summary judgment on the contract claim. Referring to the need for a legal duty upon which to predicate an alleged tort, the circuit court opined: "The only basis alleged by Gaddy for a legal duty owed to it by Mr. Lane and Bowles Rice is the alleged attorney-client relationship, and the Court has already ruled that there was no such relationship between Gaddy and the defendants."

In challenging this ruling, Gaddy asserted that in every contract there is a covenant of good faith and fair dealing. However, as the respondents observe, this covenant "does not provide a cause of action apart from a breach of contract claim." *Highmark West Virginia, Inc. v. Jamie*, 221 W.Va. 487, 492, 655 S.E.2d 509, 514 (2007). It has been observed "that the West Virginia Supreme Court of Appeals has declined to recognize an independent claim for a breach of the common law duty of good faith and has instead held that such a claim sounds in breach of contract." *Corder v. Countrywide Home Loans, Inc.*, No. 2:10-0738, 2011 WL 289343 at *3 (S.D. W.Va. 2011) (internal quotation marks and citation omitted). Given the clear contractual nature of this claim and the circuit court's

19

proper grant of summary judgment to the contract-based claims, we find no error in the trial court's decision to grant summary judgment on the petitioner's claims of negligence, gross negligence, and intentional breach.

### E. Negligent Misrepresentation

The circuit court concluded that this count, like the previous count, was directly tied to the breach of contract allegations. As with the group of claims couched in negligence, the previous disposition of the contract claim and the lack of any duty owed to Gaddy by the respondents compel the conclusion that the trial court's grant of summary judgment on the petitioner's claim of negligent misrepresentation was not made in error.

### F. Conversion

This claim, like the others, is predicated on the alleged fee-sharing agreement. Gaddy argues that the respondents' failure to give it one-third of the attorney's fees it was awarded in *Tawney* amounted to a wrongful conversion of property which belonged to Gaddy. Critical to any claim for conversion, however, is "title or right of possession." *See Thompson Dev., Inc. v. Kroger Co.,* 186 W.V. 482, 487, 413 S.E.2d 137, 142 (1991) (citation omitted). As the circuit court opined, "[b]ecause Gaddy has not demonstrated a right to possession of any portion of the Bowles Rice fee, its claim for conversion fails."

20

Accordingly, we find no error in the trial court's decision to award summary judgment on the petitioner's claim of conversion.

## G. Promissory Estoppel

Gaddy asserted in its complaint that the respondents "are estopped from claiming ownership of and retaining" its money with reference to the award of attorney's fees in the *Tawney* case. The trial court concluded that the doctrine of promissory estoppel has no application to this case. We agree. While Gaddy argues that it "has proven that it relied on the promise that . . . [Mr.] Lane made to its detriment," the record in this case fails to show the existence of that alleged fee-sharing agreement.[28] And, the petitioner, as the respondents observe, specifically chose not to accept payment of the fees that it previously submitted for the trial court's approval.[29] Absent proof of the alleged agreement, we cannot conclude that the trial court erred in determining that summary judgment was warranted on the petitioner's promissory estoppel claim.

---

[28]We wish to make clear that this Court is not deciding the issue of whether Mr. Lane made any type of oral promise to share fees with Gaddy. The issues before us do not require that we make such a determination.

[29]The respondents remain prepared to retender these funds to Gaddy.

21

## H. Unjust Enrichment

It is axiomatic that property which is the subject of an unjust enrichment claim must have been acquired by means of fraud or other similar circumstances which negate the property holder's continued retention of the subject property. *See Annon v. Lucas*, 155 W.Va. 368, 382, 185 S.E.2d 343, 352 (1971) (recognizing that relief for unjust enrichment is provided where "property which has been acquired by fraud, or . . . it is against equity that it should be retained by the person holding it"). Because the trial court had previously rejected the petitioner's claim of fraud, the trial court concluded that this claim must likewise fail. In challenging this ruling, Gaddy merely states its disagreement with the trial court's decision to grant judgment against it on the claim of fraud. We find no basis for concluding that the trial court committed error in granting summary judgment on the petitioner's claim grounded in unjust enrichment.

## I. Quantum Meruit

From the outset, Gaddy recognized that it might not be able to establish an enforceable contract and thus included a count in its complaint through which it asserted entitlement to recovery under quantum meruit. By definition, "such a claim requires as an element of recovery that the services at issue were performed under such circumstances by the individual seeking recovery that he reasonably expected to be paid for such services by the person sought to be charged." *Copley v. Mingo Co. Bd. of Educ.*, 195 W.Va. 480, 486-

87, 466 S.E.2d 139, 145-46 (1995). Examining the petitioner's claim that it was entitled to more than the fees submitted in the McCullough invoice, the trial court initially focused on the fact that Gaddy was not asked by Bowles Rice to perform any additional work after the claim evaluations were completed in July 2004 and that Gaddy did not "dispute [the respondents' contention] that its work product was never used in *Tawney*." In addition, the circuit court referenced Mr. Bullock's "failure to keep sufficient record of his work or time devoted to the Columbia matter to be able to create an invoice for that work."

After considering Gaddy's submitted documentation of its work during the relevant time period, the trial court rejected Gaddy's claim for quantum meruit relief but ruled that "Gaddy is entitled to receive the sum of $74,275.00 reflected in the McCullough invoice."[30] Barring any further submission of legitimate invoices, the trial court had no other basis from which to determine that Gaddy was entitled to be paid more money. The petitioner complains that the amount reflected in the McCullough invoice "is not enough to compensate Gaddy for its work." While that may be true in the abstract, other than the charges included in the McCullough invoice, there was simply no verifiable proof of work that Gaddy performed relevant to this matter. Accordingly, we find no error in the trial court's decision to grant summary judgment on the petitioner's claim seeking relief in quantum meruit.

---

[30]*See supra* note 29.

23

## IV. Conclusion

Based on the foregoing, the decision of the Circuit Court of Roane County is affirmed.

Affirmed.