IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0998

_____

**FILED**

**April 10, 2015**

**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

GARY W. RICH and LAW OFFICE OF GARY W. RICH, L.C.,
Plaintiffs/Counter-Defendants/Third-Party Plaintiffs Below, Petitioners

v.

JOSEPH SIMONI,
Defendant/Counter-Plaintiff Below, Respondent

v.

COCHRAN, CHERRY, GIVENS, SMITH, LANE & TAYLOR, P.C.,
Third-Party Defendant/Counter-Claimant Below, Respondent

v.

LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.,
Third-Party Defendant/Counter-Claimant Below, Respondent

v.

BARON AND BUDD, P.C.,
Third-Party Defendant/Counter-Claimant Below, Respondent

_____

Certified Question from the United States District Court
for the Northern District of West Virginia

CERTIFIED QUESTION ANSWERED

_____

Submitted: March 4, 2015
Filed: April 10, 2015

Richard W. Gallagher, Esq.
E. Ryan Kennedy, Esq.
Robinson & McElwee, PLLC
Clarksburg, West Virginia

Tillman J. Finley *Pro Hac Vice*
Marino Finley Law, PLLC
Washington, D.C.
Counsel for Petitioners

Jeffrey M. Wakefield, Esq.
Caleb P. Knight, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia
Counsel for Joseph Simoni, Ph.D.

William F. Cash III, *Pro Hac Vice*
Levin Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
Pensacola, Florida
Counsel for Levin, Papantonio *et al.*

Christopher J. McCarthy, Esq.
Booth & McCarthy
Bridgeport, West Virginia
Counsel for Third-Party Respondents

JUSTICE LOUGHRY delivered the Opinion of the Court.
JUSTICE BENJAMIN concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1.     "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court."  Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998).

2.  Rule 5.4 of the West Virginia Rules of Professional Conduct, which proscribes the sharing of fees between lawyers or law firms and nonlawyers, is an explicit judicial declaration of West Virginia public policy with the force and effect of law.

3.  A fee-sharing agreement between a lawyer or a law firm and a non-lawyer that violates the provisions of Rule 5.4 of the West Virginia Rules of Professional Conduct is void as against public policy and wholly unenforceable.

LOUGHRY, Justice:

This case is before us on certified question from the United States District Court for the Northern District of West Virginia and presents the issue of whether the West Virginia Rules of Professional Conduct ("Rules of Professional Conduct") are statements of public policy with the equivalent legal force and effect as statutes enacted by the West Virginia Legislature. The underlying case involves the issue of whether a fee-sharing agreement between the individual petitioner, an attorney, and the respondent, a non-lawyer, is enforceable. Upon our consideration of this issue, we answer the certified question, as modified, in the affirmative.

## I. Factual and Procedural Background

Beginning in the 1990s and continuing until 2011, the petitioner, Gary W. Rich, practiced law in Morgantown, West Virginia.[1] The respondent, Joseph Simoni, Ph.D., is a former professor in West Virginia University's ("WVU's") Department of Sociology and Anthropology. While on the faculty at WVU, Dr. Simoni attended the West Virginia University College of Law; he successfully obtained a doctor of jurisprudence from the WVU College of Law in 1995. Despite sitting for the West Virginia bar examination four

---

[1]Mr. Rich was admitted to the Bar of this state in 1980.

separate times, Dr. Simoni never obtained a passing score on the examination.[2]  As a result, he has never been admitted to practice law in this state or in any other jurisdiction.

In 1999, Mr. Rich and Dr. Simoni met through a mutual friend due to their respective interests in an asbestos case known as the WVU litigation.[3]  Addressing that litigation, Dr. Simoni stated that he and another "WVU faculty colleague were the driving force behind the organization of University employees and the investigation of asbestos exposure in many University buildings."  Through this collaboration, Mr. Rich and Dr. Simoni learned of other potential environmental and toxic tort mass cases, including two actions known as the Fairmont[4] litigation and the Spelter[5] litigation.  According to Dr. Simoni, he organized initial meetings and was the primary contact for the plaintiffs in the

---

[2]He did, however, pass the multi-state professional responsibility examination on at least two occasions–an examination designed to measure knowledge of ethical standards pertaining to the practice of law.

[3]Mr. Rich was introduced to Dr. Simoni as someone who could provide assistance in connection with a potential class action comprised of individuals claiming exposure to asbestos fibers in WVU buildings.  According to Mr. Rich, Dr. Simoni had "a long history of community activism in various communities in West Virginia."

[4]This litigation involved a class action of plaintiffs who allegedly suffered illnesses from contact with chemicals used at the Philips/Westinghouse Lighting Plant in Fairmont, West Virginia.  As the result of a settlement reached in 2007, Mr. Rich and his associated counsel were awarded 25% of the fee award of $14,600,000.

[5]Environmental contamination allegedly arising from a zinc-smelting plant in Spelter, West Virginia, was the focus of this class action.  The matter proceeded to trial and resulted in a plaintiffs' verdict.  After remand for the purpose of recalculating punitive damages, Mr. Rich and his associated counsel were awarded 22.5% of the total fee award of $22,800,000.

2

Fairmont and Spelter litigations. In addition to serving as the critical liaison between counsel and the plaintiffs, Dr. Simoni claims to have obtained key documents; organized property access for sample collection purposes; and researched filing fees, environmental cases, and pivotal toxic tort questions. Due to Mr. Rich's lack of expertise in these areas of practice[6] and his lack of resources to prosecute those cases, the decision was made to engage several out-of-state law firms to assist with these class actions.

The underlying litigation arose from an agreement between Mr. Rich and Dr. Simoni to compensate Dr. Simoni for his efforts in connection with various class action suits, including the Fairmont and Spelter litigations. According to Dr. Simoni, his initial understanding when he and Mr. Rich first agreed to work together was that they would "share the benefits half/half, 50/50." That notion of an even split continued until April 2002 when a discussion ensued outside Mr. Rich's Morgantown, West Virginia, office. During this meeting, Mr. Rich purportedly informed Dr. Simoni that "he was reducing [Dr. Simoni's] share from 50 percent to 20 percent."

As related by the district court in its memorandum order,[7] Mr. Rich allegedly

_____

[6]At one point, Mr. Rich's practice was largely devoted to immigration law. Dr. Simoni submits that "[t]he professional relationship between Dr. Simoni and Mr. Rich was driven, in large part, by the fact that Mr. Rich's law experience was inadequate to prosecute environmental and toxic tort class actions."

[7]The order was entered on September 30, 2014.

agreed several months later to reinstate the 50/50 fee split between Dr. Simoni and himself. Further discussions reportedly ensued in December 2003 between Dr. Simoni and Mr. Rich regarding the issue of compensation. While the two individuals were at a coffee shop in Waynesburg, Pennsylvania, Dr. Simoni recalled Mr. Rich broaching the fee arrangement topic, stating "he was changing the agreement again from the 50/50 that we had gotten to, back to in the late fall of 2002, that he was changing it back to the 80/20."[8]

The next fee-related discussions between Dr. Simoni and Mr. Rich reportedly occurred in June 2005 while the two individuals were at a picnic shelter along the Rail-Trail path in Morgantown, West Virginia. During that meeting Mr. Rich suggested that they should communicate in writing rather than verbally. Dr. Simoni's notes from that meeting "reflect that Rich confirmed his intention to pay Simoni 20% of the total compensation Rich received from the Fairmont and Spelter Litigations." As he clarified during his deposition, Dr. Simoni's expectation of compensation was tied to a successful result. If the case did not result in a plaintiffs' verdict, he would "[g]et zero."

During the summer of 2007, Dr. Simoni spoke with an attorney from the Cochran firm, one of the out-of-state law firms engaged by Mr. Rich, with regard to

---

[8]The memorandum opinion reflects that "Simoni became 'visibly upset,' and left the coffee shop in tears."

compensation tied to the Spelter litigation. Concerned that he "was being left out, you know, . . . left out to dry," Dr. Simoni asked this attorney to inform him when the Spelter litigation was finalized. After notifying him several months later regarding the conclusion of the Spelter litigation, the Cochran law firm subsequently emailed Dr. Simoni to "make sure you have submitted all final invoices to our office concerning" the Spelter litigation. Dr. Simoni indicated he "didn't send any invoices" in response to this request. In explanation, he testified: "[S]ince my compensation, as I understood, would come from the agreement that I had with Rich, . . . not until the cases were settled and based on my contributions and the value of my contributions, [I] never had the thought or expectation of having to keep hours of work or anything like that."[9] The record makes clear that Dr. Simoni's expectation of fee recovery was linked to "the prospect of 'percentage split of attorney fees earned by Rich.'"[10]

In response to Dr. Simoni's recitation of the fee-related agreement and discussions, Mr. Rich represents that he was initially under the impression that Dr. Simoni

---

[9]During the pendency of the underlying litigation, Dr. Simoni reconstructed what he views as "a reasonable list of the activities and hours expended in support of both the Philips/Westinghouse Litigation and the Spelter Litigation." The "after-the-fact" document represents that he spent 3078 hours working on those matters between March 2000 and August 2005.

[10]At the same time, however, Dr. Simoni acknowledged in his deposition that he "had the general understanding of a lawyer not being able to split fees."

5

was a licensed attorney.[11] Thus, the possibility of a fee-sharing agreement initially arose while he was under the mistaken impression that Dr. Simoni had been admitted to the bar. Once he realized in 2000 or 2001 that Dr. Simoni was not a licensed attorney, Mr. Rich states he informed Dr. Simoni that he would first need to pass the bar before he could participate in any fee-sharing arrangement.[12] Based on concerns he had regarding the propriety of fee-sharing for work performed *prior* to licensure, Mr. Rich contacted Sherri Goodman, former Chief Lawyer Disciplinary Counsel of the West Virginia State Bar.[13] She reportedly informed Mr. Rich that Dr. Simoni "might not be able to get paid ethically."

On January 13, 2012, Mr. Rich filed a complaint in the district court seeking a declaratory judgment on the issue of whether Dr. Simoni was entitled to compensation for services or activities performed in connection with the Fairmont and the Spelter litigations.[14]

---

[11]He claims to have reached this conclusion based on the fact that Dr. Simoni "had a law degree, made references to law school, and was, apparently, involved in litigation."

[12]The record reflects that the fourth and final time Dr. Simoni sat for the bar exam was in 2002.

[13]Mr. Rich indicated during his deposition that he contacted Ms. Goodman on multiple occasions with regard to the ethical issues associated with paying Dr. Simoni for his work on all three cases–the WVU litigation, the Spelter litigation, and the Fairmont litigation. He indicated that it was sometime in 2006 or 2007 when he would have had a conversation with Ms. Goodman where she indicated that quantum meruit would likely be the only type of recovery that Dr. Simoni could obtain.

[14]Dr. Simoni's threat to file complaints in state court, addressing compensation claims for the Fairmont and Spelter litigations, was the impetus for filing the district court action. In March 2010, Dr. Simoni, through counsel, sought compensation from six plaintiffs' firms

He sought a ruling as to whether a sharing of legal fees with Dr. Simoni would violate Rule 5.4 of the West Virginia Rule of Professional Conduct.[15] In response, Dr. Simoni filed a counterclaim and then an amended counterclaim, through which he alleged that Mr. Rich is obligated to compensate him for work related to the Fairmont and Spelter litigations under theories of quantum meruit, unjust enrichment, and breach of implied contract.[16] Responding to the counterclaims filed by Dr. Simoni, Mr. Rich filed a third-party complaint against three out-of-state law firms[17] involved in those class actions, asserting rights of indemnity and contribution in connection with any amounts he is determined to owe Dr. Simoni.[18]

At the conclusion of discovery in the district court proceeding, the parties filed

---

involved in the Spelter litigation by means of written correspondence to which two draft complaints were attached; in April 2010, a similar written request for compensation was sent to the three plaintiffs' firms involved in the Fairmont litigation. Despite Dr. Simoni's demands, which included a $1 million demand in the Spelter litigation, no payments were made by the solicited firms.

[15]Rule 5.4 provides, in pertinent part, that "[a] lawyer or law firm shall not share legal fees with a nonlawyer . . . ." W.Va. R. Prof'l Conduct 5.4.

[16]Dr. Simoni also included three additional legal theories, each of which has been dismissed by the district court. Those theories were grounded on allegations of negligent misrepresentation, conversion, and estoppel.

[17]Those law firms are Levin Papantonio *et al.*, the Cochran firm, and Baron & Budd.

[18]Those three law firms counterclaimed against Mr. Rich, asserting claims predicated on breach of contract, fraud, unjust enrichment, indemnity, and contribution.

motions for summary judgment. In addition to dismissing three counts of Dr. Simoni's counterclaim against Mr. Rich,[19] the district court certified the following question to this Court: "Are the West Virginia Rules of Professional Conduct statements of public policy with the force of law equal to that given to statutes enacted by the West Virginia State Legislature?"

## II. Standard of Review

As we recognized in syllabus point one of *Light v. Allstate Insurance Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998), "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Bearing this plenary standard of review in mind, we proceed to consider the certified question presented by the district court.

## III. Discussion

Squarely presented in this case is the issue previously avoided by this Court in *Gaddy Engineering Co. v. Bowles Rice McDavid*, 231 W.Va. 577, 746 S.E.2d 568 (2013): Whether a fee-sharing agreement between a lawyer and a non-lawyer is unenforceable as contrary to the public policy of this state. Having accepted the certified question presented by the district court, we must now determine whether this state's Rules of Professional

---

[19]*See supra* note 16.

8

Conduct constitute statements of public policy that carry the force and effect of legislative enactments. While the question presents a matter of first impression for this Court, multiple courts have confronted this issue and determined, with little difficulty, that a fee-sharing agreement which violates the professional rules of conduct is unenforceable as contrary to public policy. *See id.*, 231 W.Va. at 589, 746 S.E.2d at 580. (Loughry, J., concurring, and Davis, J., joining).[20]

As Dr. Simoni acknowledges, "a licensed lawyer is ethically prohibited from sharing legal fees with a non-lawyer under Rule 5.4 of the West Virginia Rules of Professional Conduct." That rule, which has several inapplicable exceptions, states with certainty that both lawyers and law firms shall not share fees with a non-lawyer.[21] *See* W.Va. R. Prof'l Conduct 5.4; *Lawyer Disciplinary Bd. v. Duty*, 222 W.Va. 758, 671 S.E.2d 763 (2008) (recognizing that lawyer may not directly or indirectly share legal fees with non-lawyer). Notwithstanding this clearly stated prohibition, Dr. Simoni submits that this ethical rule is not the same as an outright legal prohibition of fee-sharing. Arguing that the Rules

_____

[20]For ease of reference, the concurrence authored by Justice Loughry and joined by Justice Davis, will be cited throughout the remainder of this opinion without notation of the joining justice's identity.

[21]A nonlawyer refers to anyone who does not hold a valid law license, including those individuals who hold a law degree or previously held a law license. *See In Re Discipio*, 645 N.E.2d 906, 912-13 (Ill. 1994).

9

of Professional Conduct are nothing more than rules of reason,[22] Dr. Simoni posits that those rules cannot stand as a bar to the enforcement of a fee-sharing agreement that is predicated on the reasonable value of services provided.[23] Consequently, he urges us to find that the Rules of Professional Conduct do not have the equivalent weight to laws enacted by our state legislature.

While professing to occupy a position of neutrality by refusing to weigh in on the ultimate issue, Mr. Rich nonetheless invites the Court to devise a lawful manner of compensating Dr. Simoni.[24] Like Dr. Simoni, Mr. Rich is amenable to altering the certified question in a manner that would require application of quantum meruit principles to an

[22]*See* W.Va. R. Prof'l Conduct, scope ("The Rules of Professional Conduct are rules of reason.").

[23]In making this argument, Dr. Simoni necessarily reframes the certified question to pose whether the Rules of Professional Conduct prohibit fee-sharing agreements between lawyers and non-lawyers where the agreement contemplates payment based on the reasonable value of services provided–i.e. quantum meruit recovery. Not only is this an improper attempt to engraft quantum meruit-based recovery into the certified question, but the district court was clear in its memorandum order that this type of equitable-based recovery is inconsistent with Dr. Simoni's amended counterclaim in that his claim relies on the existence of a fee-splitting agreement. The district court opined in its memorandum order that "the evidence adduced in discovery . . . reinforces that his [Dr. Simoni's] compensation claim remains based entirely on a fee-splitting agreement with Rich."

[24]Mr. Rich states that he has no issue paying Dr. Simoni, provided that such payment can be accomplished within the boundaries of both ethical and legal constraints. This willingness to compensate Dr. Simoni for "the reasonable value of his time," however, is expressly conditioned on the filing of "a legally-viable, factually-supported, and ethically-proper" pleading, which is further subject to the condition that the requested payment be "limited to services Dr. Simoni performed for or at the direction of Mr. Rich."

otherwise prohibited fee-sharing agreement.   In this fashion, both Dr. Simoni and Mr. Rich

seek to circumvent the panoply of reasons against this type of fee sharing between lawyers

and non-lawyers discussed at length in the concurrence to *Gaddy Engineering*.   *See* 231

W.Va. at 589-91, 746 S.E.2d at 580-82.

We begin our analysis by reviewing the authority which supports a finding that

the Rules of Professional Conduct are statements of public policy.   As the concurring

members of the Court recognized in *Gaddy Engineering*:[25]

> Numerous other courts, when presented with the issue of
> whether rules which govern attorney conduct constitute
> statements of public policy, have resoundingly determined that
> rules of professional conduct contain explicit declarations of a
> state's public policy. *See Fields v. Ratfield*, No. A132766, 2012
> WL 5359775 at *9 (Cal.App. 2012) ("The Rules of Professional
> Conduct are not only ethical standards to guide the conduct of
> members of the bar; but they also serve as an expression of
> public policy to protect the public.") (internal quotation marks
> omitted); *Cruse v. O'Quinn*, 273 S.W.3d 766, 776 (Tex. App.
> 2008) (finding that disciplinary rules constitute an expression
> of Texas public policy on issue of fee-sharing agreements);
> *Evans & Luptak, PLC v. Lizza*, 251 Mich. App. 187, 650
> N.W.2d 364, 370 (2002) (recognizing "fundamental principle
> that contracts that violate our ethical rules violate our public
> policy and therefore are unenforceable"); *Brandon v. Newman*,
> 243 Ga. App. 183, 532 S.E.2d 743, 747 (2000) (upholding trial
> court's ruling that state bar disciplinary provisions establish
> public policy of disapproving of fee-sharing agreements with
> nonlawyers); *Albert Brooks Friedman, Ltd. v. Malevitis*, 304 Ill.
> App. 3d 797, 238 Ill. Dec. 46, 710 N.E.2d 843, 846 (1999)

---

[25]*See supra* note 20.

("Supreme court rules have the force of law and are indicative of public policy in the area of attorney conduct[.]").

*Gaddy Engineering*, 231 W.Va. at 589, 746 S.E.2d at 580.


Specifically addressing the issue of whether statements of public policy are limited to the enactments of a legislative body, the concurring members looked to the recently issued decision of *Martello v. Santana*, 713 F.3d 309 (6th Cir. 2013). In affirming the trial court's ruling that a fee-sharing agreement between an attorney and a physician was unenforceable as violating public policy,[26] the Sixth Circuit wholly rejected the argument that "'public policy can only be created by the Kentucky Legislature,' . . . reason[ing] that 'the Kentucky Rules of Professional Conduct are public policy set by the Kentucky Supreme Court.'" *Gaddy Engineering*, 231 W.Va. at 589, 746 S.E.2d at 580 (quoting *Martello*, 713 F.3d at 313). In support of this conclusion, the Sixth Circuit observed that the Restatement (Second) of Contracts, in referring to the use of legislation to identify public policy violations, defines "legislation 'in the broadest sense to include any fixed text enacted by a body with authority to promulgate rules. . . .'" *Id.* (quoting Restatement (Second) of Contracts § 178 cmt. (1981)).

---

[26]In finding the violation of public policy in *Martello*, the trial court looked to Rule 5.4 of the Kentucky Rules of Professional Conduct, a rule which parallels the provisions of this state's Rule 5.4 of the Rules of Professional Conduct by prohibiting fee-sharing agreements between lawyers or law firms and nonlawyers. *See Gaddy Engineering*, 231 W.Va. at 589, n.4, 746 S.E.2d at 580 n.4 (Loughry, J., concurring).

12

Frequently cited as authority for the position that rules of professional conduct

constitute declarations of public policy is *Trotter v. Nelson*, 684 N.E.2d 1150 (Ind.1997),

*abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007), a case in

which the Indiana Supreme Court reasoned:

> The Rules of Professional Conduct, as enacted by this Court, contain both implicit and explicit declarations of public policy. The Indiana Rules of Professional Conduct exist, to a large extent, as a means of protecting the interests of the public as potential clients. "These Rules and this Court's willingness to enforce them help ensure that the public is well served by the bar. Forces that undermine the standards on which the Rules of Professional Conduct are founded disserve the public by weakening the client-lawyer relationship."

684 N.E.2d at 1153 (footnote and internal citation omitted). In *Trotter*, the court recognized

"the heightened import of the Rules that are framed imperatively:

> Certain of the Rules are explicit declarations of what an attorney can or cannot do. They are 'cast in the terms "shall" or "shall not."' Prof. Cond. R. Preamble, Scope. Some of these imperatives concern agreements that an attorney can or cannot enter into. The Rules at issue in this case (Rules 5.4(a) and 7.3(f)) are such imperatives. *Rules 5.4(a) and 7.3(f) are explicit judicial declarations of Indiana public policy and, akin to contravening a statute, agreements in violation of these rules are unenforceable.*"

*Gaddy Engineering*, 231 W.Va. at 590, 746 S.E.2d at 581 (Loughry, J., concurring) (quoting

*Trotter,* 684 N.E.2d at 1153 (emphasis supplied)).

Fully detailed in *Trotter* are the reasons against fee-splitting agreements:

Rule 5.4(a) prohibits an attorney from sharing legal fees with a nonlawyer. This Rule states the public policy against fee-splitting with a nonlawyer. . . . [F]ee-splitting with a nonlawyer is disfavored because of its potential affect on the client-attorney relationship. For example, fee-splitting with a nonlawyer provides the incentive for a nonlawyer to recommend an attorney's services for their own pecuniary interests rather than the client's legal best interests. Furthermore, fee-splitting provides a potential disincentive to the attorney to devote their full time and energy to the client, as the attorney must share fees with another who has done little to earn it. Finally, fee-splitting might interfere with the attorney's "professional independence of judgment." Thus, in general, fee-splitting agreements with a nonlawyer are contrary to Indiana public policy and unenforceable.

684 N.E.2d at 1154-55 (internal citations omitted); *accord O'Hara v. Ahlgren, Blumenfeld & Kempster*, 537 N.E.2d 730, 734-35 (1989) (discussing "variety of harms" associated with fee-sharing agreements and recognizing that "[t]he public is best served . . . by [attorney] recommendations uninfluenced by financial considerations").

Responding to the cautionary admonition regarding the use of the Rules of Professional Conduct in civil actions,[27] the concurring members of the Court explained the

_____

[27]In the scope section of the Rules of Professional Conduct in effect at the time of the actions at issue, it is provided that the "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." The Rules further state that "[t]hey are not designed to be a basis for civil liability." W.Va. R. Prof'l Conduct, scope. While not relevant to the action before us, we note that under the Rules of Professional Conduct that took effect on January 1, 2015, the scope section has been amended to recognize that "since the Rules do establish standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct."

14

"obvious distinction between the concern expressed in the scope section of the Rules that they are not to serve as a *basis* for civil liability and the assertion by a defendant of a rule in *defense* to the enforcement of an allegedly illegal contract." *Gaddy Engineering*, 231 W.Va. at 591 n.6, 746 S.E.2d at 582 n.6. In *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364 (Mich. App. 2002), the appellate court considered the argument that its rules of professional conduct could not be used as a defense to the plaintiff's breach of contract claim based on the provision within the rules which states that the rules "do not give rise to a cause of action for enforcement of a rule or for damages caused by a failure to comply with an ethical obligation." *Id.* at 368. Reinforcing the critical distinction between employing the rules as a source of liability and asserting the rules as a legal defense, the Michigan appellate court sanctioned using the rules "as a *defense* that the alleged contract is unethical because it violates our public policy as expressed in the Michigan Rules of Professional Conduct." *Id.* Specifically rejecting reliance on the language which indicates the rules are for disciplinary purposes only and may not be used to support or shield against civil liability, the court observed the absurdity that would result if the judicial system assisted a party in enforcing an agreement that is in furtherance of a purpose which violates public policy. *Id.* at 369*; see also Institutional Labor Advisors, LLC v. Allied Resources, Inc.,* 2014 WL 4211196 at *5 (W.D. Ky. Aug. 25, 2014) (affirming *Martello* holding that courts will not enforce contracts which violate public policy while rejecting as inapposite litigant's citation of decision where court refused to recognize cause of action predicated on alleged violation of ethical rule).

15

As explained in the *Gaddy Engineering* concurrence, "[t]he fact that one party may benefit from an illegal fee-sharing agreement does not tip the proverbial scales of justice in favor of enforcement." *Gaddy Engineering*, 231 W.Va. at 591, 746 S.E.2d at 582. The reason for rejecting a parity-based result is rooted in the weightier and overarching concern for protecting prospective clients:

> Martello asserts that voiding these contracts would create a windfall for Santana at Martello's expense. This argument, while possibly true, is unpersuasive. *The Rules of Professional Conduct were not created to protect non-lawyers who enter into contracts with attorneys, but were instead designed to ensure both that the judicial process is ethical and to protect potential clients.*

*Martello*, 713 F.3d at 314 (emphasis supplied); *accord Trotter*, 684 N.E.2d at 1155 ("[W]hen a court determines that a contract must be declared void as against public policy, it does so on the grounds that the good of the public as a whole must take precedence over the circumstances of the individual, no matter the hardship or inequities that may result."); *see also Infante v. Gottesman*, 558 A.2d 1338, 1344 (1989) ("While we recognize that our decision may unjustly enrich defendant to the extent that he has received the benefit of any investigative and paralegal services performed by plaintiff, the pervasive proscriptions against such agreements require that we not render any assistance to these parties."); *O'Hara*, 537 N.E.2d at 737-38 (rejecting plaintiffs argument that lay persons be permitted to enforce fee-sharing agreement, stating that "[b]y refusing in every case to assist the lay party, courts may deter laypersons as well as attorneys from attempting such agreements"

16

and "in this way, the public will be protected more effectively from the potential harms posed by fee-sharing agreements").

In view of the highly persuasive authority throughout the country on this issue, we have no difficulty recognizing that the Rules of Professional Conduct may constitute statements of public policy which in turn may carry the equivalent force and effect as statutes enacted by this state's legislature. That determination will need to be made on a rule by rule basis, however, given that some of the rules are stated in mandatory terms while others are expressed in hortatory terms only. *See Trotter*, 684 N.E.2d at 1153 (recognizing elevated significance of rules cast in terms of "shall" and "shall not"); *Allied Resources*, 2014 WL 4211196 at *5 (recognizing that "Rules of Professional Conduct may reflect Kentucky's public policy in proper circumstances"). Finding the need to slightly modify the certified question to make it applicable to the specific rule at issue in this case,[28] we now hold that Rule 5.4 of the West Virginia Rules of Professional Conduct, which proscribes the sharing of fees between lawyers or law firms and nonlawyers, is an explicit judicial declaration of West Virginia public policy with the force and effect of law. Accordingly, a fee-sharing agreement between a lawyer or a law firm and a non-lawyer that violates the

[28]*See Kincaid v. Mangum*, 189 W.Va. 404, 413, 432 S.E.2d 74, 83 (1993) ("[W]hen a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it . . . .").

17

provisions of Rule 5.4 of the West Virginia Rules of Professional Conduct is void as against public policy and wholly unenforceable.

Based upon this Court's concerns that the attorneys involved in this case may have engaged in unethical conduct with regard to fee-sharing agreements, we are alerting the Office of Disciplinary Counsel regarding the need for further inquiry into these matters. *See, e.g., Rose ex rel. Rose v. St. Paul Fire & Marine Ins. Co*., 215 W.Va. 250, 258, 599 S.E.2d 673, 681 (2004) ("In light of the many potential transgressions in the record, we find it necessary to refer this matter to the Office of Disciplinary Counsel for further review."); *Covington v. Smith*, 213 W.Va. 309, 582 S.E.2d 756 (2003) (referring matter to Office of Disciplinary Counsel for further proceedings); Syl. Pt. 8, *Gum v. Dudley*, 202 W.Va. 476, 505 S.E.2d 391 (1997) ("When this Court believes a case before it presents the appearance of conduct that does not comport with the West Virginia Rules of Professional Conduct (RPC), we will comply with Rule 8.3(a) of the RPC and Canon 3D(2) of the Code of Judicial Conduct, and refer the matter to the Office of Disciplinary Counsel for its review and appropriate action."). Accordingly, we direct the Clerk of the Supreme Court of Appeals to transmit a certified copy of this opinion to the Office of Disciplinary Counsel.

## IV. Conclusion

For the foregoing reasons, we modify the certified question to apply to the specific rule of professional conduct in this matter, and answer the modified certified question in the affirmative.

Certified question answered.