IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**JEWELL R. HUGHEY,**
**Defendant Below, Petitioner**

**v.) No. 25-ICA-316**        (Cir. Ct. of Kanawha Cnty. Case No. CC-20-2017-C-1100)

**JAMES M. CAGLE, individually**
**and as Partner in the Firm of**
**Cagle & Jackson, and CAGLE & JACKSON,**
**Plaintiffs Below, Respondents**

**and**

**JEWELL R. HUGHEY,**
**Plaintiff Below, Petitioner**

**v.) No. 25-ICA-317**        (Cir. Ct. of Kanawha Cnty. Case No. CC-20-2022-C-160)

**P. RODNEY JACKSON,**
**Defendant Below, Respondent**

**FILED**

**June 2, 2026**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Jewell R. Hughey appeals the Kanawha County Circuit Court's July 8, 2025, order in the consolidated cases of *James M. Cagle, individually and as partner in the firm of Cagle & Jackson and Cagle & Jackson, a partnership v. Jewell R. Hughey*, Case No. 17-C-1100 and *Jewell R. Hughey v. P. Rodney Jackson, Esq.*, Case No. 22-C-160. This order denied Ms. Hughey's motion to amend her counterclaim in Case No. 17-C-1100 and her complaint in Case No. 22-C-160 to add claims for quantum meruit and unjust enrichment, granted respondents' motion for summary and delcaratory judgment regarding petitioner's breach of contract claim, and converted the preliminary injunction against her into a permanent injunction. Respondents James M. Cagle, P. Rodney Jackson, and Cagle & Jackson filed a response. Petitioner Hughey filed a reply.[1] Because these appeals from the two Kanawha County cases[2] involve the same facts and issues, we have consolidated

---

[1] Ms. Hughey is represented by Michael D. Crim, Esq. Respondents James M. Cagle, Esq., P. Rodney Jackson, Esq., and Cagle & Jackson are represented by J. Jeaneen Legato, Esq., and Mark McMillian, Esq.

[2] The circuit court consolidated Case No. 22-C-160 and Case No. 17-C-1100 and then entered a single order disposing of both. 25-ICA-316 is an appeal from the circuit court order as it pertained to *Cagle v. Hughey*, Case No. 17-C-1100, while 25-ICA-317 is

1

them for purposes of argument and decision. For reasons stated below, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

In or about 2012, Mr. Cagle was retained by the West Virginia Attorney General to prosecute claims on behalf of the State. Around that same time, Mr. Cagle and Mr. Jackson formed a partnership, known as Cagle & Jackson, for the purpose of working exclusively on cases involving opioids. In March of 2012, Ms. Hughey contracted with Cagle & Jackson to provide paralegal services to the law firm related to "pill mill litigation" against various defendants involved in the distribution of opioid pain medications. Under the parties' handwritten agreement, Ms. Hughey would make herself available for work forty hours per week, be paid $1,000 per week, and be provided with a 1099 form. This agreement also stated that she was entitled to bonuses based upon the attorney's fees the firm earned on opioid cases, could perform paralegal services for other attorneys and law firms so long as it did not interfere with her work requirements under the agreement, and that the parties could terminate the agreement at any time.[3]

Regarding bonuses, the agreement divided the litigation into the following categories: "Mingo Co. Individuals," "County Litigation," and "State Litigation." For Mingo County cases brought by individuals against pharmacies, pharmacists, and physicians, Ms. Hughey would receive a bonus of 10% of any fees earned. The fee agreement stated that if any county cases earned a fee, the amount of the bonus would be determined by Cagle & Jackson after the amount of fees earned by them had been established.[4] As for state cases, the fee agreement simply stated that: "The same provision

---

an appeal from the circuit court order as it pertained to *Hughey v. Jackson*, Case No. 22-C-160.

[3] According to Ms. Hughey, before she signed the handwritten contract involved in this case, she was working at another firm where she was paid $75,000 per year plus overtime (which together usually totaled about $100,000 per year). She alleges that she quit that job to work for Cagle & Jackson because she was promised the same salary she had been receiving at the other firm, and benefits as a full-time employee. The terms of the handwritten contract (1099 status, a salary of $52,000 per year subject to bonuses, no insurance, and no sick pay) were different than what allegedly had been promised, but she signed it on a take- it- or- leave- it basis because she had already quit her other job and did not want to be without income.

[4] Regarding county cases, the handwritten agreement states "[t]hat because this litigation also involves another law firm, the amount of [a] bonus will be determined by

as with county litigation applies to the State (AG) case. However, a bonus will be provided to Hughey."

Ms. Hughey stopped working for Cagle & Jackson on pill mill litigation after approximately five years, in mid-January of 2017. Prior to the end of her work on Cagle & Jackson's opioid cases, she was paid a bonus of $7,500 when one of the state cases settled. This was the only bonus she was ever paid in connection with the state opioid cases. The county cases never generated any fees for Cagle & Jackson which might trigger a bonus. Some of the Mingo County cases settled after Ms. Hughey stopped working with Cagle & Jackson, but she maintained that she should have been paid a bonus for those cases even though she was no longer working for the firm. The state cases allegedly generated a $10 million fee for Cagle & Jackson, and Ms. Hughey claimed that she was entitled to 10% of that amount although her handwritten contract did not say that she would receive a certain percentage of the fee for state cases. The record does not indicate what the Mingo County cases covered by the agreement settled for (unless the Preece case was covered), or what Ms. Hughey thinks her bonus should have been for them.[5]

On August 3, 2017, Mr. Cagle and Cagle & Jackson filed Case No. 17-C-1100, seeking an injunction against Ms. Hughey after it was allegedly discovered that she had been offering respondents' work product and that of co-counsel to market her services to other professionals while acting as a paralegal on respondents' behalf, saying that she was a "freelance paralegal" in opioid pill mill cases with "institutional knowledge" of the subject matter. According to respondents, Ms. Hughey told a prospective employer that she "had everything that Jim Cagle did."[6] On October 11, 2017, the circuit court held a hearing on a motion for preliminary injunction filed by respondents. Ms. Hughey did not appear at this hearing, believing that it was going to be continued because her attorney had a

---

Cagle & Jackson after the fees earned by counsel are determined by [the] Court and other counsel."

[5] Ms. Hughey worked with Mr. Cagle on a Mingo County opioid case which resulted in a settlement of $875,000 and a 10% fee to Ms. Hughey of $27,500. According to Ms. Hughey, this case settled in early 2009. It is unclear whether she was paid a bonus for the Preece case before or after she signed an agreement with the respondents in 2012.

[6] According to respondents, Ms. Hughey claimed to have all the **documents** that Mr. Cagle did. Ms. Hughey did not remember the exact words she used when talking to Mr. Simpkins, an attorney she approached about possible employment, but testified that she meant that she had all the **knowledge and experience** that Mr. Cagle did about opioid litigation. The parties do not dispute that Ms. Hughey was free to use, share, or tout her knowledge of litigation strategies employed in pill mill cases.

scheduling conflict.[7] Her counsel did attend but did not meet with Ms. Hughey prior to the hearing to prepare and did not present any witnesses or exhibits. On November 7, 2017, the circuit court issued a preliminary injunction.[8]

On March 30, 2018, respondents filed a Petition for Declaratory Judgment in 17-C-1100, asking the circuit court to declare that Ms. Hughey had breached their agreement and was not entitled to receive a bonus or any further payments, and to grant such further relief as might be appropriate, including a permanent injunction. Also on March 30, 2018, Ms. Hughey filed a counterclaim for breach of contract alleging that she had not been paid the bonuses that were due under the parties' agreement.[9] On February 23, 2023, Ms. Hughey filed a motion to amend her counterclaim to add Mr. Jackson as a plaintiff and counterclaim defendant, alleging claims for breach of contract, promissory estoppel, tort of outrage, fraud, and violations of the Wage Payment and Collection Act. Her motion to amend was denied by order entered on April 27, 2023.

On March 1, 2022, Ms. Hughey, acting pro se, filed Case No. 22-C-159 against Mr. Cagle and the partnership of Cagle & Jackson. On the same date, she filed Case No. 22-C-160 against Mr. Jackson and Cagle & Jackson. On June 21, 2022, she filed amended complaints in both cases, asserting claims for breach of contract, violation of the Wage Payment and Collection Act, promissory estoppel, fraud, negligent infliction of emotional distress, civil conspiracy/joint venture, tort of outrage, punitive damages, and breach of implied duty of good faith and fair dealing.[10] The circuit court dismissed many of the claims against Mr. Cagle and all of the claims against Mr. Jackson and Cagle & Jackson on the grounds of res judicata. Ms. Hughey appealed the order to this Court.

Our decision affirmed the circuit court's dismissal of all Ms. Hughey's claims raised in 22-C-159, and all her claims in 22-C-160, except for her breach of contract claim against Respondent Jackson, individually, and remanded the matter to the circuit court for further proceedings. *See Hughey v. Cagle and Cagle & Jackson*, No. 23-ICA-218, and *Hughey v. Jackson and Cagle & Jackson*, No. 23-ICA-219, 2024 WL 3251829 (W. Va. Ct. App. July

---

[7] Ms. Hughey is currently represented by different counsel.

[8] Ruling from the bench, the circuit court subsequently denied Ms. Hughey's motion to dissolve the preliminary injunction on February 28, 2025, but did not issue a written order memorializing this ruling and setting forth findings of fact and conclusions of law.

[9] There is no dispute that Ms. Hughey received the salary of $1,000 per week that she had been promised, in addition to the bonus she was paid when the first state case settled.

[10] This amendment did not add any claims for quantum meruit or unjust enrichment.

1, 2024) (memorandum decision). In footnote two of our 2024 opinion, we noted our ethical concerns about the fee-sharing agreement with Ms. Hughey, observing:

> While the appellate record does not show how this issue was addressed below, we would note our serious concerns about the ethical implications of the fee-sharing language in the parties' agreement in light of our Supreme Court of Appeals' holding in syllabus points 2 and 3 of *Rich v. Simoni*, 235 W. Va. 142, 772 S.E.2d 327, 328 (2015), wherein such agreements between lawyers or law firms and nonlawyers were held to be in violation of Rule 5.4 of the West Virginia Rules of Professional Conduct and void as a matter of public policy.

*Id*. at *2 n.4.

After our mandate was issued in the 2023 Appeal, the circuit court held a status conference on December 6, 2024, to determine what issues were outstanding for the court's consideration. As a result, the circuit court entered a new scheduling order and an order consolidating 22-C-159 and 22-C-160. The circuit court subsequently directed the parties to address whether the parties' fee-sharing agreement was void under *Simoni*.

In the midst of the litigation regarding Ms. Hughey's motion to dismiss, respondents moved for declaratory judgment and summary judgment against Ms. Hughey. Ms. Hughey filed a response to this motion on June 5, 2023, and a supplemental response on April 17, 2025.[11] Ms. Hughey contended that she was clearly intended to receive a portion of respondents' legal fees from the pill mill litigation, and that there were several genuine issues of material fact for jury consideration, such as the validity of the parties' agreement, its terms, and her performance thereunder. According to the circuit court's order, while Ms. Hughey made several arguments in opposition to summary judgment, she failed to address the *Simoni* decision as previously directed.

On April 24, 2025, respondents filed their reply to Ms. Hughey's supplemental response, arguing that Ms. Hughey had no viable claim and attempting to factually counter all the points raised in her supplemental response. Respondents addressed *Simoni,* and in doing so, acknowledged that this Court correctly interpreted that decision; however, respondents stated that they "preferred" for the circuit court to conclude that Ms. Hughey breached the parties' agreement. On May 1, 2025, the circuit court held a hearing on the pending motion for summary judgment regarding the breach of contract claim against Mr. Jackson. On the eve of the hearing, Ms. Hughey filed a motion for leave to amend her

---

[11] Ms. Hughey filed a supplemental response following this Court's decision in *Hughey v. Cagle and Cagle & Jackson*, No. 23-ICA-218, and *Hughey v. Jackson and Cagle & Jackson*, No. 23-ICA-219, 2024 WL 3251829 (W. Va. Ct. App. July 1, 2024) (memorandum decision).

counterclaim and amended complaint to add claims for quantum meruit and unjust enrichment.

In its order, the circuit court expressly found that the parties "purposefully side-stepped" this Court's concerns over *Simoni.* According to the circuit court, the parties each sought rulings in this case which required a judicial finding that their 2012 agreement was valid and enforceable. The circuit court rejected this notion, stating that the parties' collective decision to ignore the issue could not prevent it from complying with its duty to apply the laws of this State to the facts of the matter, a duty which required it to apply Syllabus Points 2 and 3 of *Simoni:*

> Rule 5.4 of the West Virginia Rules of Professional Conduct, which proscribes the sharing of fees between lawyers or law firms and nonlawyers, is an explicit judicial declaration of West Virginia public policy with the force and effect of law. A fee-sharing agreement between a lawyer or a law firm and a non-lawyer that violates the provisions of Rule 5.4 of the West Virginia Rules of Professional Conduct is void as against public policy and wholly unenforceable.

Syl. Pts. 2-3, *Rich v. Simoni*, 235 W. Va. 142, 772 S.E.2d 327 (2015).

The circuit court found the language of the parties' agreement "inescapable" on this issue. Specifically, the court emphasized that the "Litigation" section of the parties' agreement states under "Mingo Co. Individuals" that "Hughey shall be entitled to a bonus equaling 10% of the attorney fees earned" and the "County Litigation" subsection states that "[b]ecause this litigation also involves another law firm, the amount of the bonus will be determined by Cagle & Jackson after the fees earned by counsel are determined by Court and other counsel." The "State Litigation" portion provided that it was subject to the same terms as the county litigation. Based upon this language, the circuit court determined that the parties' use of the term "bonus" instead of "fee" was merely semantic, because under all three litigation categories Ms. Hughey was to receive a portion of respondents' attorney fees. Thus, it constituted an unlawful fee-sharing agreement.

The court found support for this ruling in *Lawyer Disciplinary Board v. Duty*, 222 W. Va. 758, 671 S.E.2d 763 (2008) (per curiam) where the Supreme Court of Appeals of West Virginia ("SCAWV") rejected a similar "bonus" argument made by a lawyer who argued he had not violated Rule 5.4(a) when he promised to give a non-lawyer employee fifty percent of the attorney's fees recovered if the employee could convince a certain client to retain the lawyer to represent him in a car accident lawsuit. Thus, based on the decisions in *Duty* and *Simoni*, the parties' agreement to share attorney fees with Ms. Hughey was void as a matter of public policy, and respondents were entitled to summary judgment on Ms. Hughey's counterclaim and complaint.

6

Next, the circuit court determined that the facts and circumstances of the case warranted converting the temporary injunction to a permanent one. Lastly, the court denied the motion to amend, finding that granting Ms. Hughey's motion would be futile because the requested amendments could not overcome the precedent established in *Simoni*. This appeal followed.

## II.     STANDARDS OF REVIEW

### A.  Motion to Amend

As the court held in Syllabus Point 6, *Perdue v. S.J. Groves & Sons Co.*, 152 W. Va. 222, 161 S.E.2d 250 (1968):

> A trial court is vested with a sound discretion in granting or refusing leave to amend pleadings in civil actions. Leave to amend should be freely given when justice so requires, but the action of a trial court in refusing to grant leave to amend a pleading will not be regarded as reversible error in the absence of a showing of an abuse of the trial court's discretion in ruling upon a motion for leave to amend.

"A trial court abuses its discretion if its ruling is based on an erroneous assessment of the evidence or the law." *Bartles v. Hinkle*, 196 W. Va. 381, 389, 472 S.E.2d 827, 835 (1996) (citations omitted). Although courts should liberally grant motions to amend, "[a] court may exercise its discretion to deny a motion for leave to amend a complaint where such amendment would not lead to a presentation of the case on its merits. The liberal amendment rules under Rule 15(a) do not require the courts to indulge in futile gestures." *Maryann Manor, Inc. v. Frankovitch*, No. 25-ICA-50, 2025 WL 3496722, *3 (W. Va. Ct. App. Dec. 4, 2025) (memorandum decision) (citation modified).

### B.  Summary Judgment

"A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of NY*, 148 W. Va. 160, 133 S.E.2d 770 (1963). "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 4, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

"A circuit court's entry of summary judgment is reviewed de novo." Syl. Pt. 1, *id.* The de novo standard requires us to review the trial court's ruling based on the same standards that the trial court should have applied. Namely, appellate courts should reverse

the trial court decision if they conclude that there is a genuine issue of material fact which presents a trial worthy issue or, alternatively, they conclude that the failure to permit discovery has denied a party the opportunity to develop facts that may have resulted in the discovery of evidence sufficient to constitute a disputed material fact.

## C. Permanent Injunction

The final order granting a permanent injunction is reviewed under an abuse of discretion standard and the underlying factual findings are reviewed under a clearly erroneous standard. *Baisden v. W. Va. Secondary Schs. Activities Comm'n*, 211 W. Va. 725, 729, 568 S.E.2d 32, 36 (2002); *see also Weaver v. Ritchie*, 197 W. Va. 690, 478 S.E.2d 363, 366 (1996). Questions of law are subject to de novo review. *Pancakes, Biscuits and More, LLC v. Pendleton Cnty. Comm'n*, No. 14-1263, 2015 WL 6143370, *3 (W. Va. Oct. 16, 2015) (memorandum decision); *Starks v. Putnam Cnty. Comm'n*, No. 23-ICA-128, 2024 WL 2859208, *3 (W. Va. Ct. App. June 5, 2024) (memorandum decision).

## D. Declaratory Judgment

A circuit court's ultimate decision in a declaratory judgment action is reviewed de novo, while "any determinations of fact made by the circuit court in reaching its ultimate resolution are reviewed pursuant to a clearly erroneous standard." *Willard v. Whited*, 211 W. Va. 522, 524, 566 S.E.2d 881, 883 (2002) (quoting *Mountain Lodge Ass'n v. Crum & Forster Indem. Co.,* 210 W. Va. 536, 545, 558 S.E.2d 336, 345 (2001) (internal quotation marks and citation omitted); *see also Hansen-Gier Family Trust of April 22, 2016 v. Haywood*, 250 W. Va. 42, 48, 902 S.E.2d 174, 180 (2024).

## III. DISCUSSION

## A. Motion to Amend

The circuit court held that amending the complaint and counterclaim would be futile because *Rich v. Simoni* precluded Ms. Hughey's claims for unjust enrichment and quantum meruit. According to Paragraph 33 of the Final Order, "the requested amendments to her counterclaim do nothing to address the *Rich v. Simoni* precedent, which is fatal to her claims, and therefore any amendment to her claims would be futile."

Ms. Hughey argues that even if her fee agreement was not enforceable, she should be able to recover compensation for quantum meruit or unjust enrichment pursuant to *Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP,* 231 W. Va. 577, 746 S.E.2d 568 (2013), where an engineering firm was allowed to recover based on quantum meruit when a fee-sharing agreement could not be enforced. The fee-sharing agreement in *Gaddy* was held to be unenforceable because of impracticability, rather than Rule 5.4, so the court did not decide whether fee-sharing agreements with nonlawyers were in violation

8

of public policy. Ms. Hughey has not directed our attention to any West Virginia case where a court awarded quantum meruit damages when a fee-sharing agreement with a nonlawyer was held to be unenforceable because it violated public policy.

Although Respondent Jackson argues that *Rich v. Simoni* precludes quantum meruit claims, as well as claims for breach of contract, he also invites us to decide the case on other grounds that the circuit court did not rely on. Specifically, he argues that Ms. Hughey waited too long under Rule 15 of the West Virginia Rules of Civil Procedure to raise her claims for quantum meruit and unjust enrichment[12], that she did not file her motion to amend in compliance with Rule 6.01(c) of the West Virginia Trial Court Rules, and that her claims for quantum meruit and unjust enrichment were barred by both the applicable statute of limitations and collateral estoppel.

In *Rich v. Simoni*, the SCAWV held that fee-sharing agreements with nonlawyers were void and unenforceable because they violated public policy as embodied in Rule 5.4. Interestingly, both parties in *Simoni* urged the court to hold that the petitioner could recover based on quantum meruit if a breach of contract claim was not viable. The SCAWV declined to do so, apparently on procedural grounds, noting that addressing whether a quantum meruit recovery was available would involve rewriting the certified question it was asked to consider, and that the petitioner's claim in the lower court had been based on breach of contract, not quantum meruit. *See* 235 W. Va. at 146 n.23, 772 S.E.2d at 331 n.23.[13]

---

[12] Rule 15 does not provide a specific time within which a motion to amend with leave of court must be filed, but undue delay is a factor which may be considered by a circuit court in the exercise of its discretion. *See* Syl. Pt. 3, in part, *State ex rel. Vedder v. Zakaib*, 217 W. Va. 528, 618 S.E.2d 537 (2005) ("Lack of diligence is justification for a denial of leave to amend where the delay is unreasonable, and places the burden on the moving party to demonstrate some valid reason for his or her neglect and delay.").

[13] Footnote 23 of *Simoni* explains:

> In making this argument, Dr. Simoni necessarily reframes the certified question to pose whether the Rules of Professional Conduct prohibit fee-sharing agreements between lawyers and non-lawyers where the agreement contemplates payment based on the reasonable value of services provided— i.e. quantum meruit recovery. Not only is this an improper attempt to engraft quantum meruit-based recovery into the certified question, but the district court was clear in its memorandum order that this type of equitable-based recovery is inconsistent with Dr. Simoni's amended counterclaim in that his claim relies on the existence of a fee-splitting agreement. The district court opined in its memorandum order that "the evidence adduced in discovery ...

We find it unnecessary to determine whether quantum meruit damages are available when a fee-sharing agreement with a nonlawyer is void and unenforceable because it violates Rule 5.4.[14] Instead, we affirm the ruling of the circuit court based on one of the alternative grounds offered by Mr. Jackson, to wit, that the motion to amend was filed less than forty-eight hours before the scheduled hearing. Rule 6.01(c) of the West Virginia Trial Court Rules provides: **"Time for Filing.** Except by permission or order of the court, no pleading shall be filed less than forty-eight (48) hours prior to oral presentation or argument of a proceeding." The record indicates that the hearing on this matter was scheduled to start at 10:00 a.m. on May 1, 2025, and that the motion to amend was not filed until 6:09:31 p.m. on April 30, 2025, only about sixteen hours before the hearing.[15] Thus, there is no question that the motion to amend was filed less than forty-eight hours before the hearing. Furthermore, there is no indication in the record that the circuit court entered an order to allow late filing or that it otherwise gave permission to file a late motion to amend.[16]

Accordingly, we find it appropriate to affirm the ruling of the circuit court based on Trial Court Rule 6.01(c), keeping in mind that West Virginia has long recognized that a judgment may be affirmed on any ground supported by the record, even if it was not relied on by the lower court. *See, e.g.,* Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W. Va. 246, 140 S.E.2d 466 (1965) ("This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment."); *Murphy v. Smallbridge*, 196 W. Va. 35, 36-7, 468 S.E.2d 167, 168-69 (1996) ("An appellate court is not limited to the legal grounds relied upon by the circuit court, but

---

reinforces that his [Dr. Simoni's] compensation claim remains based entirely on a fee-splitting agreement with Rich."

[14] Courts in other jurisdictions have reached different conclusions on this issue. *Contrast Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F.Supp.2d 9 (D. Mass. 2001); *Shtauber v. Gerson*, 239 F.Supp.3d 248 (D.D.C. 2017) (allowing quantum meruit recovery) *with Gallagher v. Weiner,* Civ. Action No. 92-1303, 1993 WL 460101, at *3-4 (D. N.J. Oct. 29, 1993); *Infante v. Gottesman*, 558 A.2d 1338, 1340, 1343-44 (N.J. Super. App. Div. 1989) (denying quantum meruit recovery).

[15] According to the hearing transcript, the hearing actually started at 10:20 a.m., but that was still much less than the forty-eight hours contemplated by Trial Court Rule 6.01 (c).

[16] Affirming a lower court ruling on alternative grounds it did not rely on would be inappropriate if there were a factual dispute which required us to weigh evidence, engage in fact finding, or make credibility determinations. *See* 5 C.J.S. *Appeal and Error* § 1031, Westlaw (database updated April 2026); 5 C.J.S. *Appeal and Error* § 839, Westlaw (database updated April 2026). Here, the necessary facts are not in dispute.

it may affirm or reverse a decision on any independently sufficient ground that has adequate support."); *Banbury Holdings, LLC v. May*, 242 W. Va. 634, 636 n.4, 837 S.E.2d 695, 697 n.4 (2019) ("We have long held that this Court may affirm a circuit court for any reason disclosed by the record."); *Carl A. v. Deborah A.*, 248 W. Va. 69, 73 n.5, 887 S.E.2d 54, 58 n.5 (2023) (upholding family court judgment because Rule 60(b)(1) motion was not timely filed, a ground the lower court did not rely on).

## B. Summary and Declaratory Judgment

The circuit court properly granted the motion for summary and declaratory judgment when it correctly held that *Rich v. Simoni* barred Ms. Hughey's claim for breach of contract because she sought to recover a bonus under an unlawful fee-sharing agreement with a nonlawyer. Rule 5.4(a) provides that "[a] lawyer or law firm shall not share legal fees with a nonlawyer" subject to certain exceptions not applicable to the present case. In Syllabus Point 3 of *Rich v. Simoni*, 235 W. Va. 142, 772 S.E.2d 327 (2015), the court held that fee-sharing agreements with nonlawyers are void as against public policy, unlawful, and unenforceable. In *Lawyer Disciplinary Board v. Duty*, 222 W. Va. 758, 671 S.E.2d 763 (2008), the court held that a nonlawyer could not receive a share of the fee as a "bonus."

Ms. Hughey argues that summary judgment was inappropriate because she was not allowed to do sufficient discovery before her claim was dismissed.[17] Although granting summary judgment is usually premature before the parties have had a reasonable opportunity to conduct discovery, additional discovery would not have created a genuine issue of material fact as to whether Ms. Hughey's fee-sharing agreement was enforceable.

Related to her discovery argument, Ms. Hughey argues that summary judgment was inappropriate because the file had been sealed. Once again, she fails to demonstrate how more access to the file would have allowed her to frame a triable issue as to her breach of contract claim because that claim was incompatible with the *Simoni* case.

## C. Conversion of preliminary injunction to permanent injunction

### 1. Standing

Ms. Hughey argues that respondents lack standing to seek injunctive relief because they were merely working for the Attorney General's Office, they were trying to protect the Attorney General's rights, and there was no hindrance to the Attorney General's Office

---

[17] Ms. Hughey's discovery appears to have been very limited. On December 26, 2018, she served Defendant's First Set of Discovery Requests. On February 14, 2023, respondents answered these discovery requests. According to Ms. Hughey, they provided limited responses and produced no documents although promising to make documents available at a time and place to be agreed on.

protecting its rights through its own efforts. This issue was not raised in the circuit court, but since standing is a jurisdictional issue, it may be raised for the first time on appeal. *See Pavone v. NPML Mortgage Acquisitions, LLC*, 246 W. Va. 418, 421, 874 S.E.2d 21, 24 (2022); *Northeast Natural Energy, LLC v. LT Realty Unlimited, LLC,* 250 W. Va. 500, 505, 905 S.E.2d 179, 184 (Ct. App. 2024). Initially, we note that the Attorney General's Office was not involved in the Mingo County cases, so Ms. Hughey's argument would not apply to those cases. As for the state litigation which was filed in Boone County, respondents have standing to seek an injunction because the files involved their clients, they were protecting their files, the respondents were obligated to obey a protective order which required the return or destruction of certain materials produced during discovery, they were obligated by ethical rules to prevent the unauthorized release of confidential or privileged material and information, they retained Ms. Hughey, gave her access to the material, and were required to inform her that certain material had to be either returned or destroyed. Attorneys have a duty to supervise nonlawyers they retain regardless of whether they are employees or independent contractors. *See* W. Va. R. Prof'l Cond. 5.3; *see generally* W. Va. R. Prof'l Cond. 1.6. If an attorney fails to meet these obligations, the attorney is subject to disciplinary actions. Accordingly, we reject Ms. Hughey's contention that the respondents lack standing.

### 2. Sufficiency of the Final Order

> A plaintiff seeking a permanent injunction must satisfy a four-factor test before the court may grant such relief and must demonstrate that: (1) it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

43A C.J.S. *Injunctions* § 42, Westlaw (database updated April 2026) (footnotes omitted). *Cf. Camden-Clark Memorial Hosp. Corp. v. Turner*, 212 W. Va. 752, 756, 575 S.E.2d 362, 366 (2002) (in considering whether to grant a preliminary injunction, courts must consider "(1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest."); *State ex rel. McGraw v. Imperial Marketing*, 196 W. Va. 346, 352 n.8, 472 S.E.2d 792, 798 n.8 (1996) (setting out "the customary standard… for issuing a preliminary injunction").[18] Respondents, as the parties seeking an injunction, have the burden of establishing the factors justifying injunctive

---

[18] The standard for granting a preliminary injunction is similar to the standard for granting a permanent injunction, but one seeking a preliminary injunction must show a mere likelihood of success on the merits, while one seeking a permanent injunction must actually succeed on the merits.

relief. *See Camden-Clark Memorial Hospital Corp. v. Turner*, 212 W. Va. at 760; 575 S.E.2d at 370. The Final Order entered by the circuit court does not discuss these factors even though a significant amount of additional evidence was submitted after the preliminary injunction order was entered.

> "'After an evidentiary hearing on a complaint for a permanent injunction, a trial court is required to make a finding of fact and conclusion of law under Rule 52 of the West Virginia Rules of Civil Procedure, and findings and conclusions also should be made upon ruling on a motion to dissolve an injunction in order to assist appellate courts in determining whether there is a legitimate area for state regulation by injunction.' Syl. pt. 4, *United Maintenance and Manufacturing Co. v. United Steelworkers of America,* 157 W. Va. 788, 204 S.E.2d 76 (1974)." Syllabus Point 2, *West v. National Mines Corp.*, 175 W. Va. 543, 336 S.E.2d 190 (1985).

Syl. Pt. 4, *Reilley v. Bd. of Educ. of Cnty. Of Marshall*, 246 W. Va. 531, 874 S.E.2d 333 (2022). If the circuit court fails to make the necessary findings of fact and conclusions of law, the case may be remanded for compliance. Syl. Pt. 5, *id.*

Rule 65(d) of the West Virginia Rules of Civil Procedure also requires circuit courts granting injunctive relief to include certain statements concerning the content and scope of injunctions in their orders, providing: (1) *Contents.* Every order granting an injunction and every restraining order shall:

> (A) state the reasons why it issued;
> (B) state terms specifically; and
> (C) describe in reasonable detail and not by referring to the complaint or other document the act or acts restrained or required.

"Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Consol. Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971).

> A permanent injunction should never be broader than is necessary to secure to the injured party relief warranted by the circumstances involved in the particular case. It should be narrowly tailored to fit the specific legal violation, and not impose any greater restriction or burden than is necessary to provide the protection sought.

43A C.J.S. *Injunctions* § 16, Westlaw (database updated April 2026) (footnotes omitted).

Rule 65's requirements that the court issuing an injunction explain its reasons, state terms "specifically," and "describe in reasonable detail… the act or acts restrained or

required" serve important purposes. A party subject to an injunction is entitled to fair notice of what is required lest he or she be held in contempt, and appellate courts tasked with reviewing injunctions need to be able to effectively review the lower court's fact finding, legal reasoning, and exercise of discretion. Moreover, in this case, potential clients and employers need to know what Ms. Hughey can or cannot do because of the injunction. Knowing that Ms. Hughey is subject to an injunction, without knowing exactly what conduct is proscribed, is bound to have a chilling effect on her job prospects if she wants to work in opioid litigation.

The circuit court's discussion of the injunction issue was cursory at best and did not provide sufficient detail to permit meaningful appellate review, consisting of only three sentences, one of which recognized that the question of whether to grant a permanent injunction was usually a matter entrusted to the sound discretion of the court. The other two sentences adopted the limited findings of fact and conclusions of law contained in the preliminary injunction order and stated:

> Accordingly, considering the facts and circumstances of this particular case, and specifically with respect to Ms. Hughey's so-called "institutional knowledge," she gained from the file contents of the Plaintiff's work product, the Court **ORDERS** that the previously entered Preliminary Injunction on November 7, 2017, is hereby converted into a Permanent Injunction. The Court adopts the findings of fact and conclusions of law previously found with respect thereto, specifically enjoining Jewell R. Hughey from soliciting persons through the use of Plaintiff's information or data she may have obtained while working for Plaintiffs in what have been described as "pill mill" cases.

The preliminary order was based on a one-sided presentation of the evidence with no input from Ms. Hughey.[19] Ms. Hughey, who was out of state, was not present when the preliminary injunction hearing was held. Her attorney at the time was present, but he didn't

---

[19] The circuit court relied on testimony by Mr. Cagle and Debbie Preece (two witnesses called by respondents); an affidavit by Mr. Cagle; an affidavit by Jeff Simpkins (an attorney allegedly contacted by Ms. Hughey to obtain employment); the verified injunction complaint; and a few exhibits. In its Preliminary Injunction order, the circuit court referred at least twice to the "uncontroverted" evidence. It was uncontroverted because there was no one at the hearing who could controvert it. In fact, Ms. Hughey had yet to file an answer to the complaint, instead filing a motion for a more definite statement, with her then counsel arguing at the preliminary injunction hearing that he did not have enough information to file an answer. The circuit court's preliminary injunction order indicates that Ms. Hughey's counsel attempted to continue the hearing as premature. According to Ms. Hughey, she did not meet with her counsel prior to the hearing to discuss possible exhibits or testimony or otherwise prepare.

offer any affidavits or witnesses in support of Ms. Hughey's position, apparently believing that the hearing was going to be continued because he had another hearing scheduled somewhere else. Nor did he explain why Ms. Hughey was absent.

After the preliminary injunction was entered, a substantial amount of additional evidence was presented to the circuit court. Ms. Hughey filed two affidavits, gave a deposition, submitted exhibits, and testified at the hearing on her motion to dissolve the preliminary injunction. Mr. Cagle also testified at the hearing on the motion to dissolve the preliminary injunction. None of this additional evidence was discussed in the circuit court's Final Order that converted the preliminary injunction into a permanent injunction.

The preliminary injunction was based in large part on the circuit court's conclusions about the existence of irreparable harm:

> Irreparable harm exits (sic) under the uncontroverted evidence … of dissemination of private and protected material precluded by a court order entered in the Circuit Court of Boone County and the use of a zip drive to extract information from Plaintiffs' computers and further from use of that information obtained by the Attorney General of West Virginia from the DEA.

Thus, the circuit court's finding of irreparable injury in its preliminary injunction order was based on three main concerns related to (a) the protective order issued in Boone County, (b) Ms. Hughey's zip drive, and (c) the information obtained from the DEA.

In the state litigation in Boone County, the defendants were allowed to designate documents produced during discovery as "Confidential" or "Highly Confidential" and material so designated was subject to protective order. The defendants used this mechanism to place internal corporate information concerning pill distribution within the coverage of the court's protective order, which required such discovery materials to be returned or destroyed when the litigation ended. The State of West Virginia succeeded in having most of this information released from the Boone County protective order, except for distribution information for three pharmaceutical companies. According to Ms. Hughey, the distribution information for those three defendants was eventually released from the protective order as well.[20] Thus, if Ms. Hughey is correct, it appears that the information

---

[20] The Charleston Gazette newspaper had the distribution data for one of the three remaining companies unsealed, and according to Ms. Hughey, the Sixth Circuit unsealed the remaining distribution data in connection with National Prescription Opiate Litigation, MDL 2804, the federal opioid MDL (multidistrict litigation) in Cleveland, Ohio. Our appendix does not contain a copy of the federal order allegedly unsealing data. According to Ms. Hughey, the distribution data released by this order has been available online through a Washington Post database for a nominal monthly subscription since 2019.

concerning pill distribution protected by the protective order in the Boone County litigation when the preliminary injunction was entered is now freely available. The Final Order entered by the circuit court does not discuss this change in circumstances and how it might affect the basis for its injunction, or the appropriate scope thereof.

Further regarding the protective order that was entered in the state litigation in Boone County, we note that it was the State of West Virginia itself which successfully moved to unseal its Second Amended Complaint, a pleading which referenced both the distribution data provided by the defendants in discovery and DEA statistics. In its briefing in support of its motion, the state acknowledged that its complaint was based on information from both the defendant pharmaceutical companies themselves and the DEA and declared that "[a]n action by the State, its agencies and officers is by its very nature one in which the public has an interest. As such it should be transparent, therefore the factual basis for the State's action should be available for all." We recognize that the duty of confidentiality under Rule 1.6 is broader than either attorney-client privilege or work product, *see* Syl. Pt. 3, *Lawyer Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995),[21] but in this case, it appears that the State did not intend its Second Amended Complaint or the corporate distribution data and DEA statistics which underpinned it to be confidential.[22] Instead, it intended that this information "should be available for all."

Subsequent to issuance of the preliminary injunction, Ms. Hughey acknowledged through affidavit and sworn testimony that she had stored some case-related information on a zip drive[23] to make it easier to respond to requests for information from the

---

[21] Syllabus Point 3 of *Lawyer Disciplinary Board v. McGraw* states:

Unlike the evidentiary attorney-client privilege recognized under *West Virginia Rules of Evidence* 501, a lawyer's ethical duty of confidentiality under Rule 1.6 of the *Rules of Professional Conduct* applies to all information relating to representation of a client, protecting more than just "confidences" or "secrets" of a client. The ethical duty of confidentiality is not nullified by the fact that the information is part of a public record or by the fact that someone else is privy to it.

[22] The Final Order does not indicate whether there may be other documents or information still subject to the protective order entered in Boone County, or identify such documents or information, if any. Nor has this issue been clearly developed on appeal.

[23] Ms. Hughey also stored some information related to opioid litigation on a laptop that was purchased in part with funds provided by respondents. According to Ms. Hughey, she deleted all information on this laptop related to respondents' opioid cases. She provided this computer to the respondents for inspection, but the device was no longer operational

respondents. She also said that all information on this zip drive related to the respondents' opioid cases had been purged, and that she had offered to make this zip drive available to the respondents for inspection, but they had never asked for it. Furthermore, she stated that she never made any disclosures to third parties which had not been authorized by the respondents or in compliance with their protocols for disclosure; that she never sold, or offered to sell, any material from respondents' files; that she never contacted any lawyers or law firms about employment related to opioid litigation other than Jeff Simpkins and Pritt & Spano Law (neither of whom hired her); that she "never gave anybody any document from Jim Cagle's file that he did not tell [her] to give"; and that she did not have any material subject to the Boone County protective order which had not been either returned or destroyed.

The circuit court's Final Order does not discuss these sworn statements by Ms. Hughey or present any findings of fact concerning her credibility, even though she contradicted much of the evidence that had been presented at the preliminary injunction hearing. Not surprisingly, since Ms. Hughey did not provide any testimony or affidavits at the hearing on the preliminary injunction, the court made no findings of fact concerning her credibility in its Order Granting Preliminary Injunction which could be adopted by reference in its Final Order. Nor did it make any findings of fact in either of these orders concerning the credibility of any other witness in this case, or why some witnesses might be more credible than others. A circuit court is not necessarily required to make detailed findings about credibility in every case, but given the circumstances of this case, the complete lack of any findings on credibility prevents us from effectively reviewing the circuit court's Final Order.

Finally, in support of its finding of irreparable injury, the circuit court relied on "use of that information obtained by the Attorney General of West Virginia from the DEA." According to Ms. Hughey, the DEA data was never sealed or placed under protective order, was freely available from public sources, including the DEA website, and was repeatedly provided by the West Virginia Attorney General's Office to newspaper reporters and law firms across the state. Moreover, as noted above, it appears that the State did not intend for

---

and respondents' expert was unable to extract any data from it. This laptop was not mentioned in the circuit court's preliminary injunction order.

distribution data to be treated as confidential client information,[24] saying in a public pleading that it should be freely available to all.[25]

Having reviewed the circuit court's rationale, as stated in its Final Order, for granting a permanent injunction, we now turn to the scope of its ruling. The circuit court's Final Order states that it was "specifically enjoining Jewell R. Hughey from soliciting persons through the use of Plaintiffs' information or data she may have obtained while working for Plaintiffs in what have been described as 'pill mill' cases." Neither the Final Order nor the previous order regarding the preliminary injunction define "Plaintiffs' information or data.[26]" The circuit court's order fails to identify whether the permanent injunction includes information or documents Ms. Hughey independently obtained through her own efforts from public sources nor does it identify to what extent Ms. Hughey may use the knowledge and experience she already possesses. We note in this regard that the Order Granting Preliminary Injunction, which was "converted into a Permanent Injunction," used somewhat different language concerning what conduct was prohibited

---

[24] Respondents rely heavily on *Legal Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995), and its discussion of client confidential information, but we find that case distinguishable. In the *McGraw* case, which involved a lawyer disciplinary matter rather than a request for injunctive relief, the Attorney General was publicly admonished when he informed a private citizen of a possible change in the Department of Environmental Protection's ("DEP") position regarding local site approval for a landfill. In that case, the client, DEP, did not move to release the information at issue. In fact, it filed an ethics complaint against Mr. McGraw, clearly indicating its displeasure with disclosure. In addition, we note that the information involved in *McGraw* was plaintiff-specific, rather than information of a general nature.

[25] Although respondents rely primarily on the protection of confidential client information in their appellate briefs, the State's action in successfully moving to release information in the Boone County action would also waive attorney-client privilege and work product concerning the disclosure of that information. *See McCormick v. Zakaib*, 189 W. Va. 258, 430 S.E.2d 316 (1993) (voluntary production of documents without objection during discovery waives both attorney-client privilege and work product). If producing material without objection during discovery can waive these protections, then surely taking affirmative action to unseal such material and make it publicly available must do so as well.

[26] We also note that Ms. Hughey's two affidavits purportedly identified all the opioid documents in her possession, but neither the circuit court nor respondents went through her lists to identify which documents were protected from disclosure. Apparently, they believed that anything related to the opioid litigation was covered, even though Ms. Hughey said that many of her documents had been obtained through her own independent efforts from public sources and then shared with Mr. Cagle. This blanket approach was probably overbroad.

than the Final Order. The order states that Ms. Hughey was "enjoined from soliciting persons through the use of the Plaintiffs' . . . information, data and research from Plaintiffs' clients, co-counsel and/or obtained and developed in Plaintiffs' pill mill related litigation whether that information exists in hard copy or in electronic form." The phrase "soliciting persons" is ambiguous because it does not clarify whether it includes potential plaintiffs, potential employers, or both. The preliminary injunction contained more than a prohibition on soliciting persons using information or documents obtained from the respondents. It also required Ms. Hughey to return any such documents to the respondents, to account for all disclosures of information to third parties, to provide "reasonable means to verify and confirm that all materials have been returned, deleted or destroyed," and that Ms. Hughey should "fully cooperate" with "such discovery as may be reasonably calculated to accomplish the foregoing." It is unclear from the order whether these requirements were incorporated into the Final Order.

Does the permanent injunction issued by the circuit court prohibit Ms. Hughey from sharing litigation strategies developed during the opioid litigation she was involved in? We do not take that to be the intention of the parties, but the language of the Final Order is arguably broad enough to encompass that subject. Such general information should be outside the scope of "client confidential information" for purposes of Rule 1.6. *See generally* Restatement (Third) of the Law Governing Lawyers § 59, Comment (3) (Am. L. Inst. 2000),[27] Hazard, Hodes, Jarvis and Thompson, *The Law of Lawyering* § 10.19,

---

[27] Section 59 concerns the definition of "confidential client information." Comment (e) provides in part:

> *e. Information concerning law, legal institutions, and similar matters.* Confidential client information does not include what a lawyer learns about the law, legal institutions such as courts and administrative agencies, and similar public matters in the course of representing clients. Such information is part of the general fund of information available to the lawyer. During legal research of an issue while representing a client, a lawyer may discover a particularly important precedent or devise a novel legal approach that is useful both in the immediate matter and in other representations. The lawyer and other members of the lawyer's firm may use and disclose that information in other representations, so long as they thereby disclose no confidential client information except as permitted by § 60. A lawyer may use such information-about the state of the law, the best way to approach an administrative agency, the preferable way to frame an argument before a particular judge-in a future, otherwise unrelated representation that is adverse to the former client. . . .

The Reporter's Note for this comment indicates that it was "based on the principles behind the concept of generally known information, the customary and accepted practices of

Illustration 10-7 (4th ed. 2025-2 Supp.) (A lawyer who develops "extraordinary knowledge about a particular niche area of the law that is central to [a] client's business" is not prohibited from representing another client in the same area of the law) ("A lawyer's knowledge about the law is not 'information relating to the representation,' because it is information that is not specific to the client. … If the rule were otherwise, no lawyer could have more than one client with respect to any particular legal issue or area of the law."). Accordingly, we vacate and remand the court's ruling on the permanent injunction with instructions to enter an order that complies with Rule 65(d) of the West Virginia Rules of Civil Procedure and the relevant case law.

## IV. CONCLUSION

We affirm the circuit court's July 8, 2025, order insofar as it denied petitioner's motion to amend her counterclaim and complaint to add claims for quantum meruit and unjust enrichment and granted respondents' motion for summary and declaratory judgment on petitioner's claim for breach of contract. We vacate the circuit court's ruling insofar as it converted the preliminary injunction to a permanent injunction and remand for further proceedings consistent with this opinion. We express no opinion as to whether the circuit court should reach a different conclusion on remand as to whether to grant a permanent injunction, but if it does, such injunction should be narrowly tailored to achieve clearly stated purposes.

Affirmed, in part, Vacated, in part, and Remanded.

**ISSUED:** June 2, 2026

**CONCURRED IN BY:**

Judge Charles O. Lorensen
Judge S. Ryan White
Judge Debra McLaughlin, sitting by temporary assignment

Chief Judge Daniel W. Greear, not participating

---

lawyers, and the public interest in effective professional practice consistent with the general protection of confidential client information."